**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JULISSA GREEN, on behalf of her minor child, DANASHA MCCORY, and as next friend of her minor grandchild, BAYLIE BELL, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) Case No. 22-cv-02918 |
| v. | ) |
| | ) District Judge Andrea R. Wood |
| THE CITY OF CHICAGO; Chicago Police Officers ANTHONY CEJA (Star #3101); JOSEPH DEFERVILLE (#19208); ROSA ELIZONDO (#18638); KEITH HARRIS (#19542); MICHAEL JOLLIFF-BLAKE (#11158); RANITA MITCHELL (#12514); LENNY PIERRI (#10956); VINCENT STINAR (#4017); ANTHONY VARCHETO (#9031); SGT. JOSHUA WALLACE (#1700); and currently UNKNOWN CHICAGO POLICE OFFICER LIEUTENANT, | ) ) Magistrate Heather K. McShain ) ) ) ) ) ) ) ) ) ) ) Jury Demanded |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago and Chicago police officers pursuant to 42 U. S. C. § 1983 for violating the Constitutional rights of two young children, stating as follows:

2.      Defendant officers executed a search warrant at plaintiffs' home and used excessive force against two little girls, 1- and 8-years-old.  Over-relying on statements from an unreliable, criminal John Doe informant, defendants failed to verify that there was any criminal activity taking place at plaintiffs' residence.  After failing to knock and announce and during the

1

course of executing the search warrant, defendant officers held the children at gunpoint when all plaintiffs were fully compliant from the start and posed no safety threat to officers. Plaintiffs followed all officer instructions from the start and at all times. Defendant officers were also verbally and physically abusive towards plaintiffs, telling them to "SHUT UP" and calling them "NIGGER." Defendant officers also tossed and searched plaintiffs' property, damaging, destroying and/or converting personal property that belonged to them.

3.      Defendants' execution of the search warrant was all for naught. They did not arrest or charge the target, plaintiffs, or anyone else in connection with the warrant. They did not find the firearm described in the search warrant or any firearm.

4.      After detaining plaintiffs and searching their apartment for approximately two hours, defendant officers simply left and never explained why they were there or who they were looking for. None of them ever apologized to plaintiffs for the way they treated them.

5.      In fine, Chicago police again terrorized an innocent family of color – including young children - for no reason. Their actions were not only completely avoidable as the product of a reckless mistake and reckless police work, but their uses of force were unnecessary, excessive, and without lawful justification.

6.      This incident was not an isolated event. As set forth below, it was undertaken pursuant to systemic City of Chicago policies of using excessive police force against children of color, including pointing guns at them, and disproportionately executing "negative" search warrants in the homes of citizens of color, based on sloppy investigations that over-rely on unverified informants.

7.      On December 22, 2020, Chicago Police Department Superintendent David Brown admitted in a public hearing before the Chicago City Council: "Over the years we have

also become too reliant on informants without third party or evidentiary corroboration. As such, CPD policies should require third party and/or evidentiary corroboration for all search warrants prior to [their] service without exception." (https://chicago.cbslocal.com/video/5133941-mayor-lightfoot-calls-on-retired-judge-toinvestigate-anjanette-young-case/)

8.     As a direct result of their exposure to defendant officers' unnecessary and terrifying conduct, plaintiffs have suffered serious, emotional and psychological distress, including many of the symptoms of Post-Traumatic Stress Disorder. These constitute scars on the children's psyches that may never heal.

## JURISDICTION AND VENUE

9.     This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

10.     Venue is proper pursuant to 28 U. S. C. § 1391(b): the underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

11.     At the time of all relevant events, plaintiff Danasha McCory was an eight-year-old girl in third grade residing with her mother at 1127 N. Mayfield, a house, in Chicago, Illinois.

12.     At the time of all relevant events, plaintiff Baylie Bell was Julissa Green's three-year-old granddaughter who was visiting her grandmother at her grandmother's house.

13.     At the time of all relevant events, Julissa Green was the natural mother and grandmother of, respectively, Danasha and Baylie and resided with Danasha and her other

3

children in her home at 1127 N. Mayfield in Chicago.  At the time, Ms. Green, a single mom, worked as a security guard at Burger King, a janitor employed by Chicago Public Schools, and a babysitter.

       14.     Plaintiffs are African American.

       15.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

       16.     At the time of all relevant events, defendant Vincent Stinar was a Chicago police officer assigned to the Narcotics Division, Unit 189.  He was the affiant of the complaint for search warrant for Tarvey Green and was assisted in the search warrant investigation by all other defendant officers, all members of Unit 189.  On information and belief, all defendant officers participated in executing the search warrant for plaintiffs' apartment, including conducting the search inside of the apartment.  Defendant officer Sgt. Joshua Wallace supervised officer Stinar's affiant investigation.  Moreover, defendant Sgt. Wallace was also the supervising officer in charge of defendant officers while they executed the search warrant in plaintiffs' apartment.  Defendant officer Anthony Ceja was in charge of the breach of plaintiffs' residence, and defendant officers Deferville, Elizondo, Mitchell, Pierri, and Varchetto were officers in charge of the entry under Wallace's supervision.  Defendant officers Harris and Jolliff-Blake were in charging of collecting and processing any evidence.  Despite plaintiffs' efforts, the Chicago police officer who was the supervising lieutenant who approved the complaint for search warrant is currently unknown.[1]

---

[1] Despite plaintiffs' pre-suit FOIA requests and plaintiffs' informal requests to all counsel for defendants, defendants have not yet provided plaintiffs with full, unredacted records regarding this  incident or with basic, identifying information for the lieutenant who approved the search warrant.  Moreover, as detailed below the defendant officers on the scene were wearing black masks over their faces (likely balaclavas, which are popular with law enforcement), refused all of Ms. Green's requests to remove their masks, and

17.     On information and belief, with one exception all the officers who participated in the execution of the search warrant were Caucasian males.

18.     When the defendant Chicago police officers executed their search warrant at plaintiffs' home, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview I:  CPD's <u>M. O.</u> is Excessive Force, Including Excessive Force Against Young Children

19.     Chicago police officers have long had a *de facto* policy, widespread practice or *M. O.* of using unnecessarily or excessive force against citizens of color, including children and youth, and against their adult family members in front of the children, which traumatizes them.

20.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.  https://www.justice.gov/opa/file/925846/download at 34. DOJ also found that CPD's uses of force, whether reasonable or unreasonable, disproportionately involve Chicago's citizens and youth of color, especially African-Americans.  (Id. at various). DOJ also found that CPD's excessive force runs the gamut of specific types of force and includes pointing guns at citizens.  (Id.).  The DOJ report's findings cover the period January, 2011 – April, 2016 (at 22-25).

21.     In addition, the 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained similar or parallel conclusions.  Among other things, it concluded that most CPD officers are not trained or equipped to interact with youth.

---

refused all of Ms. Green's requests for their names and badge numbers.  As of the date of the incident, Chicago police were not required to wear body worn cameras.

https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf at 55.

PATF recommended a number of specific reforms, including training in trauma-informed

policing, in order to improve police interactions with youth so as not to cause them trauma. (Id.).

The PATF report's findings cover the period 2011 – 2016 and, in some instances, 2007 – 2016.

(At 7-13).

22.    For years prior to September 29, 2015, citizens of Chicago made

thousands of complaints to IPRA regarding officers who used excessive force against young

children and their families, including but not limited to unnecessarily pointing guns at them.

Those complaints, if they were investigated at all, were not properly investigated, rarely

sustained, and the officers were rarely disciplined.

23.    Despite clear, actual notice of this pattern of complaints of officer

excessive force against children of color over many years leading up to September 29, 2015,

CPD and the City did not implement any changes in CPD policy, procedure or training in order

to remedy or otherwise address officers' practice of using excessive force against children.

24.    Even after being notified of the DOJ and PATF findings in 2016 and 2017,

the City did not implement any changes in CPD policy, procedure or training to address officers'

practice of using excessive force against children.  None of the reforms and new training that

CPD did undertake in the wake of the DOJ and PATF reports addressed Chicago police officers'

use of excessive force against children.  The failure to act after DOJ and PATF findings is also

proof of the City's indifference to officer excessive force against children during the period

leading up to September 29, 2015.

25.    Despite actual notice, prior to September 29, 2015, of a pattern of

misconduct complaints alleging excessive force against children, the City never made revisions

to its use of force policy that required officers not to refrain from pointing guns at or using force against children, when possible, or to otherwise use a trauma-informed approach to the use of force in situations where children are present.

26.    Following the release of the DOJ report in 2017, CPD revised its use of force policy, GO3-02, but did not include any changes that expressly require officers not to refrain from pointing guns at or using force against or in the presence children, when possible, or to otherwise use a trauma-informed approach to the use of force in situations where children are present. Nor did CPD's 16-hour officer training that accompanied implementation of the new use of force policy include any instruction regarding the use of force and children or the pointing of guns at them or others.

27.    Similarly, despite actual notice of a pattern of allegations of excessive force against children both before September 29, 2015, and at the time DOJ and PATF released their findings, CPD never revised its search warrant policy, SO9-14, or its search warrant training to include any requirements or instruction that officers refrain from pointing guns at or using force against or in the presence children, when possible, or use a trauma-informed approach the use of force in situations where children are present.

28.    Moreover, in the federal consent decree the City agreed to with the State of Illinois and that was entered by Judge Dow in January, 2019 in *State of Illinois v. City of Chicago*, 17-cv-6260, the City did not commit to any reforms to remedy the problem.

http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf

29.    Further, CPD was aware in 2014 that the International Association of Chiefs of Police (IACP) had promulgated new standards and training protocols for policing

7

children that emphasized trauma-informed policing but took no action to adopt or implement any of them.  But even today, unlike other major U.S. metropolitan police departments - such as New York, Cleveland, Indianapolis, Charlotte, Baltimore and San Francisco - CPD still does not have any policy or provide any training on policing children and youth in ways that are trauma-informed and that avoids exposing them to police violence.

30.     The traumatic and long-lasting impact on children's health from exposure to violence was well-established scientifically and well-understood by the City of Chicago prior to September 29, 2015.  Indeed, until approximately 2012 the Chicago Department of Public Health had a program, Chicago Safe Start, that trained officers in two police districts about the impact on young children of exposure to violence.  Nevertheless, the City cut, effectively terminated and failed to replace Chicago Safe Start and never applied the same knowledge and expertise to CPD officers' own conduct.

31.     In other words, despite the City's extensive knowledge, *via* Chicago Safe Start, that exposure to violence has a traumatic impact on children, CPD never implemented any policy or training to prevent officers themselves from harming children by pointing guns at them or using other unnecessary or excessive force against or in the presence of children.  Moreover, even after receiving actual notice of the DOJ and PATF findings summarized above, the City did not undertake any such training.

32.     It is widely known by CPD, which extensively patrols "high crime" neighborhoods in Chicago, that many poor children of color have already been exposed to violence and trauma in their neighborhoods.  Therefore, in such neighborhoods CPD officers *expect* to encounter children with a preexisting history of trauma.  Nevertheless, despite this knowledge and expectation, CPD failed to require or train officers to avoid pointing guns at and

otherwise using excessive or unnecessary force against and in the presence of children, with the result that their continued use of excessive force has compounded the trauma of the children they encounter.

### Overview II:  CPD Executes "Negative" Search Warrants Disproportionately in Predominantly Minority Communities, Which Traumatizes Families

33.     The CPD executes 1,500 – 2,000 residential search warrants every year. During 2016-2019, the CPD executed a total of 6,885 search warrants.

34.     The CPD disproportionately executes these search warrants in majority Black or Latino neighborhoods.  (https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/)(CBS-Chicago analysis of CPD data).  For example, during 2016-2019, a period for which data are available, the five Chicago neighborhoods in which the highest number of search warrants were executed had 80 percent or more Black or Latino residents.  (Id.).

35.     In plaintiffs' predominantly Black neighborhood on the West Side of Chicago, CPD executed far more search warrants during 2016-2019 than CPD executed in the majority white neighborhoods of Edison Park, Printers Row, Wrigleyville, Museum Campus and Magnificent Mile combined during the same time period.  (Id.).

36.     CPD also has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information.  The documented result is that nearly half – over 43 percent – of all search warrants that CPD executes are "negative," meaning that, like the search warrant in this case, they do not result in either an arrest or the recovery of contraband.  (https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-

raids/).  Of the 4,921 search warrants for illegal drugs during 2016-2019, a mere 5 percent were positive for a recovery of illegal drugs.  (Id.).

37.     Not surprisingly, the neighborhoods with the highest number of search warrant executions – predominantly minority neighborhoods - are also those that have the highest number of "negative" search warrant executions.  (Id.).

38.     The end result is that, while negative search warrants rarely result in recovery and arrest, they always result in terror and lasting trauma for innocent families of color, especially young children.  African-American children like plaintiffs are vastly disproportionately affected by CPD's negative search warrants.

39.     As illustrated by the facts of this case, negative search warrant executions follow a pattern of officer conduct that includes:  forcible entry without knocking and announcing, guns pointed directly at parents and often children, handcuffing of parents and sometimes children, abusive officer language such as cursing, insults and sarcastic jokes, damage or destruction of personal property with no repair or compensation, and long-lasting emotional trauma for family members.

40.     Many search warrants, like the one in this case, are "negative" because CPD officers completely fail to verify or corroborate in any way a John Doe's statement that criminal activity was taking place.

41.     Further, CPD fails completely to investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

42.      CPD also fails to track, audit and monitor residential search warrant executions in order to identify police practice issues (such as whether officers are conducting

investigations or surveillance to verify the current or correct address for the target) and improve investigative practices, despite the fact that such measures could boost "positive" search warrants and reduce trauma to innocent African American families with children.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a John Doe Residential Search Warrant Without Any Independent Corroboration of Criminal Activity*

43. Ever since Ms. Green moved into 1127 N. Mayfield, the Chicago police focused on her home. Apparently, her house was previously inhabited by a "big-time" drug dealer who had no relation to or connection with plaintiffs and who moved out long before they moved in.

44. At approximately 3:00PM on September 29, 2015, under defendant Sgt. Wallace's supervision defendant officer Stinar swore out and obtained a search warrant authorizing a search of Tarvey Green and the premises at 1127 N. Mayfield, Chicago, IL. The warrant authorized the seizure of a handgun and any records of residency. All defendant officers assisted Stinar in the affiant investigation.

45. Officer Stinar's complaint for search warrant stated, erroneously, based solely on information from a John Doe informant, that Mr. Green had a handgun without a firearm owner's identification ("FOID") card.

46. The informant had a criminal history. J. Does are notoriously unreliable, the least reliable type of informant. Chicago police officers are explicitly trained on these facts. Case law recognizes these facts.

47. Nevertheless, consistent with CPD's custom and practice, officer Stinar, Sgt. Wallace, and the assisting defendant officers did not bother to perform the simplest, most

routine, independent corroboration or verification of the John Doe's representation that criminal activity was taking place.

48.     Despite being strictly required by CPD policy to do so, officer Stinar, Sgt. Wallace, and all defendant officers failed to perform the most minimal verification of the information provided by the John Doe whom, they all knew, was an admitted felon with an extensive criminal history.

49.     The facts that a Chicago police officer alleges in a complaint for search warrant are and were required to be "credible and reliable." (CPD SO4-19, VI.B.a.). To this end, a Chicago police officer swearing out a search warrant under oath before a judge is and was required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant." (CPD SO4-19).

50.     And, crucially, CPD SO4-19 required the affiant of a complaint for search warrant to *independently* investigate and verify the tip provided by a John Doe confidential informant, including information that a crime was occurring or had occurred.

51.     In other words, as the sworn applicant for the warrant, officer Stinar had a duty to discover, diligently and in good faith, and to disclose to the issuing warrant judge whether a crime had occurred or was occurring at plaintiffs' house.

52.     In direct violation of CPD policy and the Fourth Amendment, officer Stinar, Sgt. Wallace, the defendant officers who assisted him, and the CPD lieutenant who approved the complaint for search warrant, if any, performed zero independent investigation or surveillance to verify that the target actually had a firearm, as the John Doe confidential informant told him.

53.     Defendant officer Stinar, Sgt. Wallace, the assisting defendants and any approving lieutenant, neglected to conduct any investigation, any verification, as was required by SO4-19.  Rather, they simply, 100 percent trusted and relied upon what the criminally active John Doe told them was true.

54.     Consequently, Stinar's sworn complaint for search warrant was fundamentally inaccurate about what was taking place inside plaintiffs' house.  In spite of what he and the assisting officers told the Judge, Chicago police did not have probable cause to believe that Mr. Green had a handgun in the house and, by extension, to enter and conduct a search of plaintiffs' apartment.

55.     Because defendant officers failed in their minimal official duty to independently investigate and corroborate the Doe's claim that a crime was being committed - when they had obvious reason to doubt the veracity of the information provided by the criminally active and unreliable John Doe - theirs was not a good faith error.

56.     Furthermore, on information and belief, any CPD lieutenant who approved officer Stinar's complaint for search warrant simply "rubberstamped" it, without taking any steps to ensure that Stinar and other the defendants had performed the due diligence required by CPD Special Order S04-19.  Taking these vital steps was what the lieutenant was officially required to do pursuant to S04-19.

57.     In the alternative, Stinar and other defendants simply applied for the search warrant without first securing the approval and signature of any CPD lieutenant, in direct violation of the requirements of S04-19.

58.     On September 29, 2015, defendant officer Stinar, Sgt. Wallace, assisting defendant officers, and the approving CPD lieutenant, if any, reasonably knew or should have

known that the intended target of the search warrant did not have a gun at plaintiffs' address. They had good reason to suspect that this statement contained in Stinar's sworn complaint for search warrant was materially false and were well-aware they had done nothing to investigate or corroborate the information.

59.     Finally, as is customary, no defendant officer, in the course of obtaining and executing the search warrant, took any steps to first determine whether children resided in the house, to avoid entering at times when children were likely to be present, to plan their entry and use of force tactics in light of the anticipated presence of children, or to deescalate their use of force tactics when they unexpectedly encountered young children in plaintiffs' apartment. As a result, officers injured the minor plaintiffs Danasha and Baylie.

### *Defendant Officers Point Their Guns at 1- and 8-year-old Children, Call Plaintiffs "Nigger," and Convert and Destroy Their Personal Property*

60.     At approximately 10:00PM on Tuesday, September 29, 2015, plaintiffs were sleeping in their respective bedrooms when defendant officers began to execute the search warrant.

61.     Suddenly and without knocking or announcing their office and without waiting any amount of time, all defendant officers – dressed in dark, plain clothes and Chicago police vests - forcibly kicked open and down the front door to plaintiffs' house with one, hard "BANG" and stormed inside with their guns drawn. On information and belief, officers, including officer Ceja, the assigned breacher, did not use "the ram" to break into plaintiffs' home.

62.     When Ms. Green and Danasha first heard, "THIS IS THE POLICE! THIS IS A RAID!", defendant officers were already in their house.

14

63. When Ms. Green got up and went to the living room to see what was happening, approximately 5-6 officers – including, on information and belief, defendants Ceja, Deferville, Elizondo, Mitchell, Pierri, and Varchetto - pointed their guns, both pistols and rifles, directly at and "in" her face at nearly point-blank range, just inches from her head and, later, at her daughter and granddaughter. Some rushed past her to open the back door for other defendant officers to enter, including defendants Harris, Joliff-Blake, Stinar, and Wallace, each of whom also pointed their guns at all plaintiffs. Defendant officers did not lower their guns that were pointed at Ms. Green, even long after she fully complied with all of their commands.

64. Ms. Green immediately asked defendant officers what was going on. Defendants did not answer her. Instead, they ordered her to "SIT ON THE COUCH!" in the living room, told her, "YOU CAN'T MOVE!" and handcuffed her.

65. One of defendant officers then took Ms. Green's one-year-old granddaughter, Baylie, from her bedroom where she was sleeping peacefully and brought her to Ms. Green. Defendant officers then handcuffed Ms. Green in front of her body and had her hold her woken granddaughter Baylie in her handcuffed arms. The handcuffs were painful.

66. Ms. Green then sat painfully handcuffed on the couch while holding Baylie for approximately two hours while defendant officers searched the house. Ms. Green became cold, as she was wearing only a t-shirt and shorts (- she had been in bed asleep when officers entered). Ms. Green asked to be allowed to put some clothes on, but officers refused her request.

67. Once Ms. Green was seated on the couch with Baylie, one defendant officer, holding his handgun with both hands, pointed and trained it at close range directly at Ms. Green's head and at Baylie for a full 15-20 minutes, even Ms. Green and Baylie sat completely

15

still and were fully compliant, following all instructions from the start.  Both Ms. Green and Baylie began to cry.

68.     When defendant officers entered plaintiffs' home, except for officer Pierri all defendant officers wore black face masks, like ski masks or balaclavas (which are common with officers), which covered the entire face, head and neck, except for eye slits and made it impossible for Ms. Green to see and identify or remember their facial features.  Ms. Green told defendant officers that they are not supposed to have masks on.  She specifically and repeatedly asked to see their faces.  But defendant officers all refused to take their masks off.

69.     Moreover, Ms. Green repeatedly asked defendant officers to identify themselves by name and star number; they all refused her requests.  Furthermore, while she was able to see name plates or badges for some of the defendant officers, they refused her request to be allowed to get up from the couch in the living room to retrieve pen and paper in order to write them down.

70.     When Danasha, in her back bedroom, heard shouting, she got up and started to leave her room to see what was happening.  Her bedroom door was open.

71.     A defendant officer, believed to be defendant officer Pierri, who briefly brought Ms. Green to Danasha's bedroom in order to ask Ms. Green who the girl was, pointed his handgun directly at 8-year-old Danasha for several minutes.

72.     Next, even though she was only 8, defendant officers then confined Danasha in her bedroom by herself, telling her to "STAY PUT" and "STAY IN YOUR ROOM" and not to come out.  Danasha's bedroom was located in the back of the house, near the kitchen, far away from the living room where her mother was being held.

73. An armed officer remained by Danasha's room, standing guard and just watching her. Deprived of the company and comfort of her mother, Danasha felt scared, lonely, and uncomfortable.

74. Ms. Green repeatedly asked officers why they were holding eight-year-old Danasha alone and separated from her. Defendant officers would not answer her or bring Danasha to her.

75. Defendant officers later searched Danasha's room in front of her while she was in her room, finding nothing. However, in the process, they broke her bedroom door in front of her.

76. Defendant officers also confined Ms. Green's disabled son in the kitchen by himself and questioned him.

77. All defendant officers were rude, insulting and verbally aggressive towards Ms. Green.

78. They repeatedly threatened Ms. Green that, if she did not tell them where the guns and drugs were, she would lose her Section 8 housing voucher. There were no guns and drugs, and during the course of their search defendant officers never found any.

79. While being held at gunpoint, Ms. Green asked only reasonable questions. She repeatedly asked all defendant officers why they were searching her house, what they were looking for, who the search warrant was for, where the search warrant was (they would not show it to her), whether anyone was going to jail, and how long officers were going to be in her house. In response, all defendant officers ignored all of Ms. Green's questions and would give her any information, at one point yelling at her, "SHUT THE FUCK UP!"

80.     Ms. Green repeatedly asked all defendant officers where the search warrant was.  Defendants, including affiant Stinar and Sergeant Wallace, each of whom had it in their possession, simply refused to show it to her.  Two hours later, as they were leaving, defendant officers left it on the table.

81.     When Ms. Green continued asking questions, one officer finally told her, "SHUT UP, NIGGER!"  At that moment, Ms. Green's one-year-old granddaughter was in her arms.  Once the officer said that to her, Ms. Green was so insulted and fearful that she stopped asking questions and said nothing to the officers.

82.     All defendant officers searched Ms. Green's small house for two hours, far longer than was necessary to cover such a small area.

83.     During the course of their search, all defendant officers "tore up" Ms. Green's bedroom – they flipped over her bed, dumped all of her clothes from her dresser drawers and her closet onto the floor, damaged other personal property, and converted $1,000 in cash. Ms. Green had recently cashed her paycheck.  Defendant officers never inventoried any of the cash that they confiscated.

84.     Also during the course of the search, a defendant officer approached Ms. Green and asked her, "Where are your pillow cases?"  Defendant officers then took and used two of Ms. Green's pillowcases to put "evidence" in and transport it out of the house.  Ms. Green did not see defendants with a bag that resembled an evidence bag.

85.     When Ms. Green asked what defendants were putting in the pillowcases and taking out, they all refused to tell her, saying in effect, "Don't worry, it doesn't matter."  She asked, "Are you taking clothes, shoes… What are you taking?"  Again, none of the defendant

officers would answer her.  Ms. Green never learned what officers took.  One told her curtly, "You can read it in the report."

86.     Defendant officers also confiscated documents from plaintiffs' house.

87.     All defendant officers remained in Ms. Green's home for a total of approximately two hours, holding her and the girls in detention for all of that time.

88.     In the end, after the two-hour search, officers did not arrest or charge anyone in connection with the search warrant, including the target and including plaintiffs. Defendant officers did not find any handgun in the house as referenced in the search warrant.

89.     No defendant officer ever explained or apologized to Ms. Green or Danasha.  They were insulting, sarcastic, rude, profane, disrespectful, and cocky.  They demeaned plaintiffs, treating them as though they were criminals.

90.     Subsequently, Ms. Green phoned in a complaint to IPRA, which never contacted her again or followed through with any investigation.

### Officers' Uses of Force Against Plaintiffs Were Unnecessary and Excessive

91.     At no time did plaintiffs present any threat, real or apparent, to the defendant officers who entered into and searched their home.  Plaintiffs followed all instructions and were fully compliant from the start and at all times.

92.     Even though they presented no threat, all defendant officers repeatedly pointed their guns at all plaintiffs, and no defendant officer intervened to request that another stop doing so, despite having multiple, reasonable opportunities in which to do so.

93.     Moreover, plaintiffs posed no threat whatsoever to defendant officers after the latter discovered that there was, in fact, no gun located in the apartment.

94.     Plaintiffs have been harmed by all defendant officers' unnecessary pointing of guns at them, unlawful detention of them, and unlawful search of their persons and home, and unlawful destruction of their personal property.

### *Officers' Unnecessary Uses of Force Traumatized the Children for Years Afterwards*

95.     Defendant Chicago police officers' terrorizing conduct towards the minor plaintiffs caused immediate, severe and long lasting emotional and psychological distress and injury.  Although the incident occurred seven years ago, plaintiffs remain deeply affected by defendant officers' misconduct.

96.     In addition to the excessive force used, plaintiffs were subject to and remember officers screaming, shouting, insulting, cursing at and threatening them and their loved ones.

97.     Prior to September, 2015, plaintiffs were happy, healthy people in a close, loving family.  Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives.  They believed the police would protect and help them.  This all changed with defendants' actions.

98.     Throughout their encounter with police, plaintiffs were terrified and crying.  They were physically cowering.  Based upon what they witnessed, they feared officers were going to shoot and kill them.

99.     Ever since the incident, plaintiffs have continued to re-live, in various ways, how terrified they were that day.

100.     After the incident and to this day, Danasha has trouble sleeping at night. She often has to watch two movies in order to fall asleep.  She had no trouble sleeping or falling asleep before the incident.

101.     Before the incident, Danasha was a cheerful, happy child who played with other kids on her block.  Since the incident, she no longer plays with others, is quiet or is outright aggressive and mean towards others.  Since the incident, she dresses in all black.

102.     Since and as a result of the incident, Danasha does not trust the police, turns away from them whenever she sees them, and feel extremely nervous whenever she sees police.

103.     On information and belief, Baylie has also been traumatized by defendant officers' execution of a search warrant in her grandmother's home.

104.     Psychiatric research shows that infants and toddlers notice and remember traumatic events.  Even though they lack verbal ability to describe them, their reactions are remembered in their bodies with increases in stress hormones.  Because infants and toddlers are helpless and depend on their parents or main caregivers for a sense of safety and security, they are also very sensitive to problems affecting their caregivers, including their caregivers' expressed emotions of fear, sadness or being overwhelmed.  They are also very sensitive to what is happening in their household, including hostile or loud noises that are distressing.

105.     Infant/toddler trauma can seriously disrupt important as aspects of child development that are scheduled to occur before the age of three, including bonding with parents, the development of language, mobility, physical and social skills and managing emotions.

106.     While Baylie may have been too young to have understood what guns are, she perceived noise and commotion and saw the room and house suddenly fill with strangers moving and sounding aggressive and commanding.  Through the terrified reactions of her grandmother, a main caregiver with whom she was bonded emotionally and physically, she felt and experienced an existential threat to her sense of physical safety and emotional security in her

home, and she suffered serious emotional distress as the result. Defendant officers' display of excessive force, including pointing guns at her, traumatized Baylie, which will have a lasting, deleterious effect on her growth and development.

107. Plaintiffs had to move from their home less than a year following the incident because they felt too traumatized by what had happened in the house.

108. Plaintiffs continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

109. On information and belief, plaintiffs have, or have many of the symptoms of, severe Post-Traumatic Stress Disorder as the result of defendant officers' conduct.

110. On information and belief, plaintiffs need high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

111. Defendant officers' shocking actions of repeatedly pointing and training loaded guns at close range on plaintiffs, especially Danasha and Bailey, when they posed no threat constituted serious abuses of power and authority.

112. Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed at young children whose sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

113. Defendant officers' conduct was undertaken pursuant to and is part of the long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force noted above, which includes the use of unnecessary force against and/or in the presence of children, especially children of color.

*Tolling of the Statute of Limitations On the Minors' Claims*

114.  Although the incident took place September 29, 2015, pursuant to Illinois' tolling provision for minors, 735 ILCS § 5/13-211, the statutes of limitations on the minor plaintiff's claims was tolled on the date that their claims accrued and remains tolled until the minor plaintiffs reach the age of majority (which they have not yet done), at which point the applicable statutes of limitations begin to run.  In this case, Danasha and Baylie will reach the age of majority in July, 2025, and November, 3032, respectively.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO
### (Minor Plaintiffs)

115.  Minor plaintiff Danasha and Baylie re-allege paragraphs 1-114 above, including the *Monell*-related allegations of paragraphs 19-42, and incorporate them all into this count.  Through their mother/grandmother, they assert this claim against defendant City of Chicago.

116.  Defendant officers' use of excessive force against Danasha and Baylie was directly and proximately caused by one or more of the following four, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, and *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against citizens, including children and youth; 2) a failure to have any policy about when it is appropriate for officers to draw their guns and point them at citizens, including children; 3) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against citizens, including children and youth and/or their close relatives in the minors' presence; and 4) an absence of official policy and

training for officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children.

117.　Each of these policies existed for more than six years prior to September 29, 2015 ("the *Monell* period") and was the moving force behind the officers' conduct that resulted in the violation of plaintiffs' constitutional rights and the direct causal link between the City's actions/inaction and the deprivation of their rights.

118.　First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against citizens, including children and youth.

119.　Of the hundreds of citizen misconduct complaints filed with Chicago's Independent Police Review Authority ("IPRA") during the *Monell* period that involved allegations of officer excessive force against a young child or youth, including pointing guns at them, none were sustained, none resulted in any officer discipline, and the vast majority of complaints were not even investigated.  Moreover, as DOJ and PATF found for this same period, civilian excessive force complaints, including those involving the unjustified pointing of guns at children, were not investigated or inadequately investigated, were rarely sustained, and the involved officers were never disciplined.

120.　This set of City's widespread practices or customs directly encouraged, sanctioned, authorized and was the moving force behind officers' conduct towards plaintiffs. The City's historical failure, leading up to September 29, 2015, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of children and youth, sent officers the clear message that they had a general freedom and license to engage in excessive force, including excessive force against children, without fear

of being corrected, investigated or disciplined. This caused defendant officers to act without appropriate restraints towards the minor plaintiffs.

121.    The City had notice during the *Monell* period of each of these failures of official accountability from a long-standing, continual stream of excessive force lawsuits and misconduct complaints to IPRA, including those alleging excessive force against young children, that were not properly investigated, if investigated at all, and never resulted in officer discipline. The continual stream of excessive force lawsuits and complaints to IPRA, including those in which children were victims, constituted actual and constructive notice to the City of a pattern and practice of excessive force against children that required remedial action.

122.    Second, contrary to commonly accepted standards and best practices in law enforcement, CPD failed to have any official policy, guidance or training regarding when it is appropriate for officers to draw their service weapons, have their guns out, and point them at citizens, including and especially children. In fact, CPD has long refused and still refuses to even refer to an officer pointing a gun at someone as "a use of force." These failures gave officers official legal sanction and free reign to point their guns at citizens, including children like plaintiffs, without any official restraint or consequences.

123.    Third, defendant officers' conduct towards and in the presence of plaintiffs was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to refrain from pointing guns at and otherwise avoiding the use of excessive or unnecessary force against or in the presence of children or youth when possible.

124.    Despite notice to IPRA prior to September 29, 2015 of a pattern of misconduct complaints and lawsuits alleging excessive force against children, the City failed to

address this problem by adopting any such policies or training.  This failure amounted to a deliberate and conscious choice not to take action to prevent future violations of people's constitutional rights, including the minor plaintiffs.'  In other words, the City opted not to adopt any reforms despite the known and obvious risk that the pattern of excessive or unnecessary force noted in these misconduct complaints would lead to constitutional violations in the future.  The City knew that, without reforms, children's rights would be violated in the future.  Thus, the City's failure to implement reforms was a foreseeable cause of plaintiffs' injuries.

125.    Even after the DOJ and PATF findings regarding force and children were known to final City policy makers in 2016 and early 2017 – constituting another source of actual notice to the City - the City failed again to implement any reforms to remedy the ongoing pattern and practice of excessive force against children and youth.  This failure amounted to another deliberate and conscious choice not to take action to prevent future violations of people's constitutional rights, including the minor plaintiffs,' and also reveals the City's attitude of deliberate indifference prior to September 29, 2015.  In the wake of the DOJ and PATF findings, the City opted not to adopt any reforms despite the known and obvious risk that the pattern of excessive or unnecessary force noted by DOJ and PATF would continue to lead to constitutional violations.  The City knew that, without reforms, children's rights would continue to be violated. This constitutes evidence of the City's deliberate indifference before September 29, 2015.

126.    Both before September 29, 2015, and after the PATF and DOJ findings in 2016 and early 2017, the City's decisions not to reform official policies and training included, without limitation:

a.    The continued absence of any provision in CPD's official use of force policy that would require or guide officers to refrain from pointing guns at or using

excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may necessary;

   b.   CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit requirement or guidance that officers should refrain from pointing guns at or otherwise avoid using excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may be necessary;

   c.   CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (ii) to avoid entry and search at times when minors are likely to be present (iii) to plan manner of entry and force tactics based on whether minors are expected to be present; (iv) to de-escalate themselves or change tactics when they unexpectedly encounter children or youth, and/or (v) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

   d.   CPD's rebuff, both before and after the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered to provide or draft model use-of-force policies that included explicit provision for avoiding excessive or unnecessary use of force against and in the presence of children;

e. City's refusal or failure, despite its extensive knowledge, *via* Chicago Safe Start, of the traumatic effect of exposing children to community violence, to continue, expand, or reinstate any training to prevent officers themselves from harming children by pointing their guns at them or otherwise using excessive or unnecessary force against them or in their presence;

f. City's and CPD's refusal or failure to propose or commit to, in the consent decree it negotiated and is now implementing in *State of Illinois, v. City of Chicago*, 17-cv-6260, any explicit protections for children from officers who would point their guns at them or otherwise not refrain from using excessive or unnecessary force against them and any provisions requiring a trauma-informed approach to policing children.

127. Fourth, the City's lack of official policies to protect citizens, including children, from officers pointing guns at them and other excessive or unnecessary force, combined with its failure to hold accountable officers who use excessive force, resulted in a *de facto* City policy and practice of using unreasonable force against citizens, including children and youth, as concluded by DOJ and PATF. This widespread practice was the moving force and direct causal link behind the officers' pointing of guns at plaintiff on September 29, 2015. The excessive force used against plaintiff was an example of and result of this *de facto* policy.

128. Similar incidents of excessive force against young children of the same approximate age as the minor plaintiffs are the direct and foreseeable result of the same set of City policies.

129. For example, a civilian misconduct complaint filed with IPRA in 2012 alleged that on March 26 of that year Chicago police officers forcibly entered the residence of Crystal Hall at 725 N. Central Avenue, apt. 104, in Chicago, pushed and choked her after she

told them she was pregnant, and pointed their guns at her 8-year-old daughter, "KH." The family is African-American. IPRA never investigated the complaint, and the involved officers were never disciplined.

130. Another civilian misconduct complaint filed with IPRA in 2012 alleged that on November 29 of that year at 7:45AM inside Near North Elementary School, 739 N. Ada Street in Chicago, an off-duty Chicago police officer slammed a 12-year-old female student, "AT," to a wall and then to the floor, physically injuring her, for refusing to show the officer the inside of her book bag. AT is African-American. IPRA's deficient investigation ignored the significance of available video, hastily reached a finding of "unfounded," and the officer was never disciplined.

131. A lawsuit (N. D. Ill. 14-cv-9042) filed in 2013 alleged that on August 29 of that year Chicago police officers of the Area Central Gun Team executed a search warrant at 930 N. Keystone Avenue in Chicago for a person with no connection to the residence and pointed a rifle with a laser light directly at the chest of 3-year-old "DS" and pointed a handgun at her grandmother Emily Simmons' head in front of Davianna when neither presented any apparent threat to officers. The family is African-American. Even after the City settled the City settled the case for $2.5 million, the involved officers were neither investigated nor disciplined for their conduct towards DS.

132. As a further example, a civilian misconduct complaint filed with IPRA in 2014 alleged that on November 18 of that year at 7:11pm in the vicinity of 3000 N. Harlem Avenue in Chicago, Chicago police officers pulled over a vehicle and approached it with guns drawn and pointed at all occupants, including 5, 12 and 13-year-old children ("AC," "PC" and "MQ"), a boy and two girls, respectively. They ordered the family out of the car at gunpoint and

slammed an adult female to the car and handcuffed her.  The family is Latino.  IPRA's investigation, which did not interview the accused officers, held the allegations "not sustained," and the officers were never disciplined.

133.    Prior to the September 29, 2015 incident involving plaintiffs, a 2014 IPRA misconduct complaint filed by Latasha Hoard alleged that on July 29, 2014, while executing a search warrant at 707 N. Lotus Avenue, basement apartment, in Chicago, officers pointed guns at 12-year-old female (whose name is redacted in the IPRA complaint), ordered her to get down on the kitchen floor and handcuffed her too tightly.  The family is African-American.  IPRA closed the complaint without investigation, and the officers were never disciplined.

134.    On March 23, 2016, while executing a search warrant at 5720 W. Eerie Street, apartment 1, in Chicago, Chicago police officers pointed guns at the head of a 5-year-old boy, "RD," yelled at him, pointed guns at the head of his 81-year-old grandfather, Frank Vance, and shoved him to the floor.  The family is African-American.  IPRA failed to investigate the incident fully before finding the allegations "not sustained," and the officers were never disciplined.

135.    Following plaintiffs' incident on September 29, 2015, in another illustration of the same pattern, on November 7, 2017, while executing a search warrant at 3557 S. Damen Avenue, 2nd floor, in Chicago for a target who actually lived in the building's 3rd floor apartment, a group of patrol officers pointed a handgun and an assault rifle directly at 5- and 9-year-old Jack and Peter Mendez and their parents, Hester and Gilbert Mendez, when none of them presented any apparent threat to officers.  The Mendez family is Latino.  Despite a COPA investigation and a lawsuit, the officers have not been investigated or disciplined for the incident.

136.    As a further example, on August 9, 2018, while executing a search warrant at 5033 S. Hermitage, 1st floor apartment, in Chicago for a person with no connection to the apartment or the residents (he was later apprehended in the building next door), members of the Area South Gun Team and the Alpha SWAT team pointed assault rifles at a 4-year-old girl, Lakai'Ya Booth, her 8, 11 and 13-year-old siblings, and their mother and grandmother, Ebony Tate and Cynthia Eason, none of whom presented any apparent threat to officers.  Ms. Tate, her children and mother are African-American.  Despite a COPA investigation and a pending lawsuit, officers have not been investigated or disciplined for the incident.

137.    Similarly, on March 15, 2019, while executing a search warrant at 8914 S. Laflin in Chicago, members of the 7th District Tactical Team and the SWAT Alpha Team pointed assault rifles at 6, 8, and 9-year-old Royalty, Royal and Roy Smart and their mother, Domonique Wilson, as they walked from their house to the street with their hands up and then handcuffed 8-year-old Royal for approximately 40 minutes when none of them presented any apparent threat to officers.  Ms. Wilson and her children are African-American.  Despite a COPA investigation and a pending lawsuit, officers have not been investigated or disciplined for the incident.

138.    As a final illustration, on December 25, 2019, while investigating a robbery in Rogers Park, Chicago patrol officers entered a family's condominium at 1227 West Albion Avenue in Chicago without authorization and pointed handguns at 13-year-old "LJ," handcuffed one of his wrists, and dragged him through the apartment for several minutes before realizing their mistake, apologizing and departing.  LJ is African-American.  Despite a COPA investigation, the officers have not been investigated or disciplined for the incident.

139.    Fifth, CPD has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information, with the consequence that the overwhelming majority of warrants executed are "negative," i.e., they result in no arrest.  But they consistently result in excessive force, terror and lasting trauma to innocent residents, including young children.

140.    CPD fails to investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

141.    Nor does CPD audit, monitor or track residential search warrants in the aggregate, even on a sample basis, in order to identify police practice issues (such as whether officers are doing enough to verify the current or correct address for the target) and improve practices, including investigative and use of force practices, despite the fact that such measures could boost "positive" warrant results and inflict less trauma on innocent bystanders, including young children.

142.    Through their combined failures above, before and after actual and constructive notice, to enact official reforms that protect children from excessive and unnecessary force and to hold accountable officers who use excessive force against them or in their presence, the City has long led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, BIA, the Chicago Police Board, IPRA, COPA or the City of Chicago Inspector General ("IG").  These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of the minor plaintiffs, providing them a general license to use excessive force, including excessive force against minors, whenever it suited them.

143.     Thus, through their combined failures, before and after actual notice, to enact official policies protecting citizens, including children, from excessive or unnecessary force and to hold accountable officers who use excessive force against or in the presence of children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the IG, the Mayor, and the Chicago City Council – condoned, approved, authorized, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of children and youth.

144.     Finally, during all times relevant to the incident involving plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children and youth and/or their close relatives in the minor's presence.  Defendant officers' conduct toward the minor plaintiffs, including their failure to intervene and failure to report the actions of their colleagues, was the direct and foreseeable result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

145.     By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of excessive or unnecessary force, including against or in the presence of children and youth, defendant City of Chicago has manifested conscious and deliberate indifference to the deprivation of the minor plaintiff's constitutional rights.

146.     One or more of these four official policies, failures of official policy, practices and customs collectively, were the moving force behind defendant officers' conduct

that directly and proximately caused the violations of the minor plaintiffs' constitutional rights set forth above and below, such that the City of Chicago is liable for officers' conduct.

### *The City of Chicago's Policies Resulted in Violations of the Minor Plaintiff's Constitutional Right to be Free of Excessive Force*

147.    Officers' conduct toward plaintiff constituted excessive force, in violation of his rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

148.    Under the circumstances, officers' pointing of guns at plaintiffs and other displays of force against and in the presence of the minor plaintiff were totally unnecessary, unreasonable and unjustifiable.

149.    Under the circumstances, officers' uses of force against and in the presence of the minor plaintiff, undertaken in the presence of and witnessed by other plaintiffs, were totally unnecessary, unreasonable and unjustifiable.

150.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to the minor plaintiff's constitutional rights.

151.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

152.    The officers' misconduct was undertaken pursuant to and as the direct, foreseeable and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of excessive force against and in the presence of the minor plaintiff.

153.    Further, no officer present on the scene intervened to stop officers from pointing guns at plaintiff.  One or more officers had a reasonable opportunity to prevent or stop

the violations of the minor plaintiff's constitutional rights but stood by and failed to take any action.

154.    As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

155.    Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

156.    As the direct and proximate result of officers' misconduct, the minor plaintiffs Danasha and Baylie have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

## COUNT II – EXCESSIVE FORCE – 42 U.S.C. § 1983
### (Minor Plaintiffs)

157.    Minor plaintiffs Danasha and Baylie, through Ms. Green, re-allege and incorporate paragraphs 1-18, 43-114, and 231-236 above and below into this count. Plaintiffs assert this claim, pursuant to 42 U.S.C. § 1983, against defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake, each of whom pointed their firearm directly at plaintiffs on September 29, 2015, in the manner described above.

158.    These defendant officers' conduct towards plaintiffs – i.e., repeatedly pointing handguns and rifles directly at plaintiffs' heads, faces and bodies when all plaintiffs were fully compliant and posed no threat – constituted excessive force, in violation of plaintiffs' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. Under the circumstances, defendants' use of force was totally unnecessary, unreasonable, and unjustifiable.

159.    Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to plaintiffs' constitutional rights. One or more defendant

and/or non-defendant officers had a reasonable opportunity to prevent or stop the repeated

violations of plaintiffs' constitutional rights alleged in this count but stood by and failed to take

any action despite opportunities to do so.

160.    Defendants' misconduct was undertaken with malice, willfulness, and

reckless indifference to the rights of others.

161.    As the direct and proximate result of defendants' misconduct, plaintiffs

have suffered and will continue to suffer severe, long-term emotional and mental distress and

trauma, including lasting or permanent psychological injury.

## COUNT III – UNLAWFUL SEARCH – INVALID WARRANT - 42 U. S. C. § 1983
### (Minor Plaintiffs)

162.    Plaintiffs re-allege paragraphs 1-18, 43-114, and 231-236 above and

below and incorporate them into this count.  They assert this claim against defendant officers

Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake,

and any CPD lieutenant who approved the search warrant, each of whom participated in

obtaining the search warrant for plaintiffs' apartment.

163.    These defendant officers unreasonably approved, obtained and executed a

search warrant that they knew was based on unreliable information because they had not

investigated, verified or corroborated with any other source the John Doe informant's claim that

the target was in possession of a handgun in plaintiffs' house.  This fact invalidated the warrant

from the start, prior to execution.

164.    Officers' subsequent unauthorized entry and search violated plaintiffs'

Fourth Amendment right to be free from unreasonable searches of their persons and homes.

165.    As the sworn applicant for the warrant, officer Stinar and the defendant

officers who assisted him, including Sgt. Wallace, had an official duty to discover and disclose to

the issuing magistrate whether the informant's tip and statements to them were reliable, including any reason they had to believe they were not reliable.

166.    Based on their complete lack of independent investigation, officers Stinar, Wallace, and other defendant officers reasonably knew or should have known that the intended target(s) of the warrant did not possess a handgun inside plaintiffs' house.

167.    Officers Stinar, Wallace, and other defendant officers who assisted them had an official duty to independently investigate and verify information they received from the felonious John Doe.

168.    Officers Stinar, Wallace, and other defendants had multiple sources of information available to them with which to investigate and corroborate whether criminal activity was taking place in plaintiffs' house.

169.    But, on information and belief, they recklessly did not conduct any independent investigation or verification of the informant's tip whatsoever.  And the CPD lieutenant who approved the search warrant, if any, failed to verify that they had performed an independent investigation such that probable cause existed.

170.    Consequently, in his complaint for search warrant defendant Stinar presented information he knew was not reliable because he had not investigated or verified it. Because defendant officers recklessly failed to independently investigate and verify whether the target was in possession of a handgun at plaintiffs' house, theirs was not a good faith error.

171.    The CPD Lieutenant who approved officer the application for search warrant, if any, did so without ensuring that he and other officers had performed the due diligence required by CPD Special Order S04-19.

172.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

173.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

174.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority.  Defendant officers' actions – of relying solely on location information provided by a criminally active confidential informant and not conducting their own investigation and surveillance - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

175.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

176.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### COUNT IV – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983
#### (Minor Plaintiffs)

177.    Plaintiffs re-allege paragraphs 1-18, 43-114, and 231-236 above and below and incorporate them into this count.  They assert this claim against all defendant officers who entered and/or searched their apartment, detained and pointed guns at them, including officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

178.    The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

179.    For example, when these officers entered plaintiffs' apartment, they forcefully entered plaintiffs' building and apartment without knocking and announcing themselves and their office in circumstances where it was required, they pointed pistols and rifles at plaintiffs, including Danasha and Baylie, at close range when they posed no threat, they failed to care for the well-being of the children, they screamed and cursed at and insulted plaintiffs, and they intentionally damaged or destroyed plaintiffs' personal property and did nothing to arrange for repair of the damage.

180.    In addition, officers' exceeded the amount of time reasonably necessary to do a search of the tiny house.

181.    Further, it was unreasonable for officers to detain plaintiffs for the amount of time they did, which was longer than necessary to complete a search for a handgun, and in the degrading and humiliating manner they did by insulting them, calling them "nigger," refusing to provide a copy of the search warrant, refusing answer their questions, and damaging or destroying their personal property.

182.     Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

183.     Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

184.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

185.     Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

186.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

187.     In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

## COUNT V – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (Minor Plaintiffs)

188.     All plaintiffs re-allege paragraphs 1-18, 43-114, and 231-236 above and below and incorporate them into this count.  They assert this claim against defendant officers who detained them for too long, in an unreasonable manner, with unreasonable force, under degrading and humiliating conditions and against those who declined to intervene in same, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

189.     These defendant officers arrested and imprisoned plaintiffs, including two young children, when, without a valid search warrant, a warrant for their arrest and without probable cause to arrest, they confined them for longer than required to conduct a search for a handgun and in a threatening, degrading, and traumatizing manner by pointing guns at them and calling them names.  This was unreasonable under the circumstances, given that they were not suspects, posed no threat whatsoever to officers, and officers should have completed the search for a firearm much sooner.

190.     Officers' actions constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

191.     When these defendant officers confined plaintiffs in this manner, they unlawfully deprived them of their dignity and their liberty to move about, despite the fact that they had not done nothing illegal, were not a safety threat, and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

192.     Moreover, each defendant officer had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

193.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

194.    Plaintiffs, including a child, were acutely aware of and were harmed by officers' confinement, as detailed above.

195.    Defendant officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

196.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continued to suffer injury and harm.

## COUNT VI – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (Minor Plaintiffs)

197.    Plaintiffs incorporate paragraphs 1-18, 43-114, and 231-236 above and below and assert this claim against all defendant officers who participated in the search of plaintiff's residence and the destruction of their personal property, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

198.    As set forth above, these defendant officers unnecessarily and willfully damaged or destroyed plaintiffs' personal property during the course of their search.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused.

199.    Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

200. Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

201. Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

202. As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including deprivation of their right to property, financial harm and emotional distress.

## COUNT VII – ASSAULT – STATE LAW
### (Minor Plaintiffs)

203. Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 231-236 above and below in this count. They assert this claim against all defendant officers who entered plaintiffs' apartment and pointed guns at them, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

204. The actions of the defendant officers set forth above, including pointing guns at close range at young children, created reasonable apprehensions in plaintiffs of immediate, harmful contact to plaintiffs' persons. These actions exceeded defendants' lawful authority under the circumstances because a) when they seized plaintiffs in this manner, they were executing a search warrant that they knew or should have known were invalid *ab initio* for lack of probable cause and b) pointing and training firearms on plaintiffs, especially children, when they were totally compliant and did not pose any threat to officer safety constituted unreasonable or excessive force.

205. The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

206.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

207.     The conduct of defendants in entering and executing a residential search warrant and pointing guns at the residents is generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

208.     The officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

209.     Plaintiffs have been seriously harmed by officers' actions.

## COUNT VIII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
**(Minor Plaintiffs)**

210.     Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 231-236 above and below in this count.  They assert this claim against defendant officers who detained them for too long, in an unreasonable manner, with unreasonable force, under degrading and humiliating conditions and against those who declined to intervene in same, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

211.     These defendant officers arrested and imprisoned plaintiffs, including a young child, when, without a valid search warrant, a warrant for their arrest and without probable cause to arrest, they confined them for longer than required to conduct a search for a handgun and in a threatening and humiliating manner by pointing guns at them for several minutes and calling them names and insulting them.  This was unreasonable under the circumstances, given

that they were not suspects, posed no threat whatsoever to officers, and officers should have completed the search much sooner. Officers' actions restrained plaintiffs and confined them to a small, bounded area.

212. These defendant officers intended to restrain and confine plaintiffs to bounded areas within or outside the house.

213. In the alternative, the conduct of these defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

214. The conduct of these defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

215. Officers' actions caused the restraint and confinement of plaintiffs to a small, bounded area within their residence.

216. Plaintiffs were harmed by these officers' actions in restraining and confining them, as detailed above.

### COUNT IX - INTENTIONAL INFLICTION
### OF EMOTIONAL DISTRESS – STATE LAW
**(Minor Plaintiffs)**

217. Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 231-236 above and below in this count. They assert this claim against all defendant officers who entered plaintiffs' apartment, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

45

218.    The actions, omissions and conduct of defendant officers set forth above –
including but not limited to failing to knock and announce, pointing guns at plaintiffs, confining
Danasha to her room, yelling at and calling Ms. Green "nigger," and damaging or destroying
plaintiffs' property - were extreme and outrageous and exceeded all bounds of human decency.

219.    Officers' actions, omissions and conduct above were undertaken with the
intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high
probability that their conduct would cause such distress, or in reckless disregard of the
probability that their actions would cause such distress.

220.    Officers, who occupied positions of special trust and authority, knew, had
reason to know or believed that plaintiffs' family, which included young children, were
especially vulnerable and fragile.

221.    As a direct and proximate result of officers' extreme and outrageous
conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and
trauma.

222.    In the alternative, the conduct of defendants was willful and wanton and
constituted a course of action which shows an actual or deliberate intention to cause harm or
which, if not intentional, shows an utter indifference to or conscious disregard for the safety of
others and/or their property.

223.    The conduct of defendants in entering and executing a residential search
warrant and pointing guns at residents are generally associated with a risk of serious injuries.
Numerous prior injuries have occurred to civilians in this context.  Officers failed to take
reasonable precautions after having knowledge of impending danger to plaintiffs.

224.    Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT X - TRESPASS – STATE LAW
### (Minor Plaintiffs)

225.    Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 231-236 above and below in this count.  They assert this claim against all defendant officers who entered plaintiffs' apartment, including defendant officers Stinar, Wallace, Ceja, Deferville, Elizondo, Mitchell, Pierri, Varchetto, Harris, and Jolliff-Blake.

226.    By obtaining and executing a search warrant when officers knew or should have known that the informant's tip was not reliable because they failed to do independently verify or corroborate it and, thus, did not have probable cause to believe the target in possession of a firearm at plaintiffs' apartment, defendant officers did not have legal authorization to enter and search plaintiffs' property.  Consequently, they physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

227.    In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

228.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

229.    Officers' actions caused a physical invasion of plaintiffs' residence.

230.    Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW
**(All Plaintiffs)**

231.     Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 157-224 above and below in this count.  Plaintiffs assert this claim against defendant City of Chicago.

232.     In committing the acts and omissions alleged above, defendants officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

233.     Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

## COUNT XII – INDEMNIFICATION – STATE LAW
**(All Plaintiffs)**

234.     Plaintiffs re-allege and incorporate paragraphs 1-18, 43-114, and 157-224 above and below in this count.  Plaintiffs assert this claim against defendant City of Chicago.

235.     Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

236.     Defendant officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.     Compensatory damages;

b.     Punitive damages where pled in the counts above;

c.       Reasonable attorney's fees and litigation costs and expenses; and

d.       Such other or further relief as the Court deems just.


Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com


## JURY DEMAND

Plaintiffs demand trial by jury.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on September 7, 2022, filing and service of the foregoing *Amended Complaint* was accomplished pursuant to

ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com