**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JULISSA GREEN, on behalf of her minor child, DANASHA MCCORY, and as next friend of her minor grandchild, BAYLIE BELL, | ) ) ) | Case No. 22-CV-02918 |
| | ) | Hon. Andrea R. Wood, |
| Plaintiffs, | ) | District Judge |
| | ) | |
| v. | ) | Hon. Heather K. McShain, |
| | ) | Magistrate Judge |
| THE CITY OF CHICAGO, *et al.* | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO BIFURCATE *MONELL* CLAIMS**

# EXHIBIT G

# SEG

---

Smith Economics Group, Ltd.

A Division of Corporate Financial Group

*Economics / Finance / Litigation Support*

Stan V. Smith, Ph.D.
President

March 13, 2017

Mr. Al Hofeld
Law Offices of Al Hofeld, Jr., LLC
1525 E. 53rd Street, Suite 832
Chicago, IL  60615

Re:  Simmons v. City of Chicago, *et al*. – Expert Report

Dear Mr. Hofeld:

You have informed me that Officers of the Chicago Police Department ("CPD") executed a search warrant at the home of Keith and Emily Simmons on August 29, 2013.  Mr. and Mrs. Simmons' daughter, Aretha Simmons, and Aretha's daughter, Davianna, who was three-years-old at the time, also lived in the home at the time.  Emily, Aretha and Davianna were home when the police arrived.  According to the Complaint, police officers pointed and held a gun, at point-blank range, to the chest of Davianna Simmons as well as to the head of Emily Simmons, in Davianna's presence.  Another officer assaulted Aretha on the front porch of the home, then pushed her inside, violently shook her upper body and repeatedly slammed her into a wall and radiator in the foyer. Davianna also saw the officer shake and slam her mother.  She also saw an officer destroy her room and toys during the course of the search.[1]

## I.  ASSIGNMENT

You have asked me to provide a statistical analysis of the dispositions of complaints against CPD officers made by citizens who complained of excessive force and the other types of misconduct alleged in this case.  Our analysis of the disposition includes whether or not the complaints were sustained after an investigation and whether sustained complaints led to meaningful discipline for the accused officers.  In particular, you asked me to answer the following questions for the period August 29, 2013 – August 29, 2013 ("the *Monell* period" in this case):

1.	What was the probability that CPD or IPRA would sustain against a Chicago police officer for (a) excessive force (b) excessive force against a minor (c) excessive force against a young child (d) illegal search (e) damage/trespass to property (f) any misconduct against a minor (g) any misconduct against a young child (h) failure to intervene (i) unconstitutional seizure of property (j) unnecessary use/display of weapon?

---

[1] Information based on plaintiffs' Complaint, Pages 1-2.

# SEG

2.      What was the probability that a CPD officer would be disciplined for each type of complaint above?  What was the probability that such discipline would ultimately be reversed by CPD and never served?

3.      What was the probability that a police officer would receive meaningful, final discipline for a sustained complaint of each type above, defined as suspension of 10 days or more or termination?

4.      Did the City, CPD, BIA and IPRA sustain complaints against and discipline officers significantly less often where the complainant was African-American?

5.      What was the probability that an excessive force complaint would be sustained against a "repeat offender," defined as an officer with 10 or more excessive force complaints against him or her in a 10-year period?

6.      What was the probability that meaningful discipline would result from sustained complaint against a "repeat offender," defined as an officer with 10 or more excessive force complaints against him or her in a 10-year period?

7.      How do CPD and IPRA's complaint and sustained complaint data compare to with that of other police departments or law enforcement agencies around the country or with the national average?

8.      Based upon your analysis of the data, did defendant officers have reason to believe on August 29, 2013, that they could act toward plaintiffs with impunity, i.e., that they would not be effectively investigated or meaningfully disciplined by CPD, BIA and IPRA?  If so, did that have anything to do with plaintiffs' race?

9.      Based on your data analysis, what was the probability that meaningful discipline would have resulted to defendant officers from CPD's, BIA's and IPRA's accountability and disciplinary systems?

10.     Does your data analysis contain evidence of a Code of Silence within CPD and IPRA, defined as "the tendency to ignore, deny or cover up the bad actions of a colleague or colleagues"?

I answer each of these questions through the presentation of the data and my data findings below.


## II.  QUALIFICATIONS AND EXPERIENCE

I am President of Smith Economics Group, Ltd., headquartered in Chicago, IL, which provides economic and financial consulting nationwide.  My *curriculum vitae* is attached, listing all my publications in the last 10 years and beyond.

2

# SEG

I received my Bachelor's Degree from Cornell University.  I received a Master's Degree and my Ph.D. in Economics from the University of Chicago; Gary S. Becker, Nobel Laureate 1992, was my Ph.D. thesis advisor.  The University of Chicago is one of the world's preeminent institutions for the study of economics, and the home of renowned research in the law and economics movement.

As President of Smith Economics, I have performed economic analyses in a great variety of engagements, including business valuation, financial analysis, antitrust, contract losses, a wide range of class action matters, employment discrimination, and intellectual property valuations including evaluations of reasonable royalty.

I have more than 40 years of experience in the field of economics.  I am a member of various economic associations and served for three years as Vice President of the National Association of Forensic Economics (NAFE), which is the principal association in the field.  I was also on the Board of Editors of the peer-reviewed journal, the <u>Journal of Forensic Economics</u>, for over a decade; I have also published scholarly articles in this journal. The JFE is the leading academic journal in the field of Forensic Economics.

I am the creator and founder of Ibbotson Associates' <u>Stocks, Bonds, Bills, and Inflation</u> (SBBI) Yearbook, Quarterly, Monthly, and SBBI/PC Services published by Morningstar, Inc.  SBBI is widely relied upon and regarded as the most accepted and scholarly reference by the academic, actuarial and investment community, and in courts of law.  I have worked as an economic and financial consultant since 1972, after completing an Internship at the Federal Reserve, Board of Governors, in Washington, D.C.

I wrote the first textbook on Economic Damages that has been used in university courses in various states; as an adjunct professor, I created and taught the first course in forensic economics nationwide, at DePaul University in Chicago.  I have performed economic analysis in several thousand cases in almost every state since the early 1980s.

In addition, I have worked in investment banking, initially as an investment banking analyst and financial analyst at The December Group in 1975.  Over the years, I have raised millions of dollars in capital for new and existing enterprises, for venture capital enterprises, and for firms that I have founded.  I have also worked on many mergers and acquisitions and have conducted many business valuations.

At the University of Chicago, Econometrics was one of my two fields of concentration in my doctoral program in Economics.  Econometrics is the quantitative analysis of statistical specialized quantitative approach to analyzing statistical data.  At Cornell University, I earned my Bachelor of Science degree in Operations Research, which required a significant core requirement in statistical analysis.  I have conducted statistical analyses in thousands of reports over prior decades.

3

# SEG

## III.  INFORMATION REVIEWED

In order to perform this evaluation, I have reviewed the following information:

1. The Complaint;
2. Plaintiffs' First Amended Discovery Requests to All Defendants;
3. Plaintiffs' Second Discovery Requests to All Defendants;
4. The data produced by the CPD's Bureau of Internal Affairs, Analytical Section, in response to Requests 43 through 49 and 51 through 53 from the Plaintiffs' First Amended Discovery Requests to All Defendants;
5. The publically-available data from the Invisible Institute's Citizens Police Data Project regarding complaint investigative findings and discipline outcomes for the complaints of interest in this case found at https://cpdb.co/data;
6. The "June 2016" Invisible Institute dataset containing the name all police officers accused in complaints from approximately August 2013 to June 2016, found at https://github.com/invinst/chicago-police-data;
7. The Citizens Police Data Project Glossary of terms found at https://cpdb.co/glossary;
8. The complaint category tables created by Internal Affairs Division of the CPD;
9. The Complaint Recommendation Code Table of the CRMS, showing the three digit discipline codes;
10. The Data Analysis Memo prepared by Dr. Steven Whitman for the *Obrycka v. City of Chicago* case dated December 9, 2009;
11. The Data Analysis Memo prepared by Dr. Steven Whitman for the *Padilla v. City of Chicago* case dated June 21, 2012;
12. *The Investigation of the Chicago Police Department* report by the United States Department of Justice, Civil Rights Division and United States Attorney's Office, Northern District of Illinois dated January 13, 2017;
13. *Preventing and Disciplining Police Misconduct: An Independent Recommendations Concerning Chicago's Police Disciplinary System* by Ron Safer, Kish Khemani, and James O'Keefe from December 2014;
14. *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve* April 2016 report by the Police Accountability Task Force;
15. Police Officer complaint and discipline data for the New York Police Department found at www1.nyc.gov/ccrb/policy;
16. *Citizen Complaints about Police Use of Force*; Department of Justice Special Report, June 2006 (Revised October 27, 2016), NCJ 210296;
17. *Police Behavior during Traffic and Street Stops, 2011*; Department of Justice Special Report, September 2013, NCJ 242937.
18. The Chicago Police Department's 2010 Annual Report;
19. The Notice of F.R.C.P. 30(b)(6) Deposition of Defendant City of Chicago and the appendices thereto;
20. The Employee Complaint Histories from CRMS for Incidents from January 1, 2000 to February 27, 2017 for the defendant officers (CITY-AS-018162 – CITY-AS-018175);
21. The Employee Complaint Histories for Incidents covering from January 1, 1967 to February 27, 2017 for defendant officers in previous cases with complaints against minors (CITY-AS-015302 – CITY-AS-015339);

Smith Economics Group, Ltd.  ■  312-943-1551

# SEG

22. The deposition of Stephen Beirne dated January 11, 2017, and the exhibits thereto;
23. The deposition of Donald J. O'Neill dated January 17, 2017, and the exhibits thereto;
24. The deposition of Robert Klimas dated February 7, 2017;
25. The deposition of Bruce Dean dated February 9, 2017; and
26. The Case Information Form.

## IV. STATISTICAL ANALYSIS OF COMPLAINT DATASETS

### 1. Definitions of Key Terms

Complaint: A formal allegation of wrongdoing filed against a named member of the Chicago Police Department (CPD). A Complaint can contain one allegation against one officer, or multiple allegations against each of numerous officers. The Invisible Institute data I reviewed calls these complaints "allegations." To be consistent, I refer to all allegations in this report as "complaints."

Complaint Register (CR): The file created by an investigator at the Bureau of Internal Affairs (BIA) or Independent Police Review Authority (IPRA) in the course of an investigation of alleged wrongdoing by a police officer.[2] Each CR can contain one complaint made against one officer or multiple complaints made against multiple officers. Each complaint in a CR can have a different investigative finding.

Complaint Register Management System (CRMS): The database used by IPRA and the CPD to track officer complaints and used to produce the CPD data in this case.[3] Each CR has its own ID number in CRMS.

Complaints of Interest: Complaints containing the types of allegations made by the Simmons family against the defendant police officers in this case. I have reviewed and analyzed datasets of complaint investigative findings and discipline recommendations and outcomes for each of these types of complaints of interest. Complaints of interest include Excessive Force complaints, Illegal Search complaints, Damage/Trespass to Property complaints, Neglect of Duty/Failure to Intervene complaints, Unconstitutional Seizure of Property complaints, and Unnecessary Use of/Display of Weapon complaints.

Finding: The determination made regarding whether the facts alleged in the complaint occurred and, if so, whether the actions taken by the accused officer violated CPD policy. Here are the possible complaint findings:[4]
- "No Affidavit": The reporting party did not sign a sworn affidavit and the investigation is summarily ended.
- "Unfounded": The allegation is false or not factual (e.g., the complained-of conduct did not occur).

---

[2] https://cpdb.co/glossary.
[3] Beirne Deposition, Page 27.
[4] https://cpdb.co/glossary.

5

# SEG

- "Not Sustained": The evidence was insufficient to either prove or disprove the complaint.
- "Exonerated": The incident occurred, but the action taken by the officer(s) was deemed lawful and proper.
- "Sustained": The allegation (complaint) was supported by sufficient evidence to justify disciplinary action.

Complaint Category Code: The CRMS data point indicating the type of misconduct alleged in a complaint. These codes have two numbers followed by a letter. For example, CR files labelled with category code 10J are for alleged "Search of Person Without Warrant" offenses.

Meaningful Discipline: A recommendation or outcome of a suspension of 10 days or more or administrative termination or separation imposed on an officer accused of wrongdoing.

## 2. CPD-Produced Data

The Chicago Police Department (CPD) electronic data produced by the City of Chicago in response to Requests 43 through 49 and Requests 51 through 53 of the Plaintiffs' First Amended Discovery Requests to All Defendants. Each dataset produced by the CPD contains a disclosure stating, "This data is only as accurate as the CRMS system." At CPD, data is manually entered into CRMS, and some CRs are missing information in data fields, such as, data for race, gender, or age demographic information.[5] Additionally, some CRs do not include information in the initial discipline and/or final discipline columns, which is likely the result of data entry error or system failures.[6]

The age-dependent datasets produced in response to Request Numbers 44, 45, 48, and 49 include CRs wherein either the victim or the complainant fit the age criteria on the date of the incident, which is age 0 to 17 for minors and age 0 to 7 for young children.[7]

Figure 1 below lists the specific data requested and produced by the CPD. CRs labelled with complaint category codes 05G and 05N appear in the data produced in response to both Request Numbers 43 and 53, as shown in Figure 1 below. All other CRs only are listed in only one CPD-produced dataset.

---

[5] Beirne Deposition, Page 66.
[6] *Ibid., Page 95.*
[7] *Ibid., 118-119.*

Smith Economics Group, Ltd. ■ 312-943-1551

# SEG

Figure 1

Description of Data Requested and Provided

| Request Number | Data Requested |
|---|---|
| 43 | All Excessive Force complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 44 | Excessive Force complaints with a minor (age 0 to 17) victim or complainant filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 45 | Excessive Force complaints with a young child (age 0 to 7) victim or complainant filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 46 | All Illegal Search complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03B and 03C |
| 47 | All Damage/Trespass to Property complaints filed between January 1, 2009 and November 9, 2016 covering complaint category code 08K |
| 48 | All complaints with a minor (age 0 to 17) victim or complainant filed between January 1, 2009 and November 9, 2016 |
| 49 | All complaints with a young child (age 0 to 7) victim or complainant filed between January 1, 2009 and November 9, 2016 |
| 51 | All Neglect of Duty/Failure to Intervene complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 10J and 10U |
| 52 | All Unconstitutional Seizure of Property complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 04E and 08F |
| 53 | All Unnecessary Use of/Display of Weapon complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 05G and 05N |

This data produced by the CPD was provided in Microsoft Excel files, with one workbook containing the complete dataset produced for Requests 44 through 49 and Requests 51 through 53. Multiple datasets were produced for Request Number 43, each with its own Excel workbook. Figure 2 below lists the specific data produced by CPD in response to Request Number 43. I have added a set number to each dataset produced in response to Request Number 43 (shown in the left column of Figure 2).

# SEG

Figure 2

Description of Data Provided in Response to Request Number 43

| Set Number | Data Description |
|---|---|
| 43.1 | All Open and Closed Excessive Force complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 43.2 | All Sustained Open and Closed Excessive Force complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 43.3 | All Sustained Open and Closed Excessive Force complaints filed between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B, Leading to Suspensions of 5 Days or More or Termination |
| 43.4 | All Open and Closed Excessive Force complaints filed by African-Americans between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 43.5 | All Sustained Open and Closed Excessive Force complaints filed by African-Americans between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |
| 43.6 | All Sustained Open and Closed Excessive Force complaints filed by African-Americans between January 1, 2009 and November 9, 2016, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B, Leading to Suspensions of 5 Days or More or Termination |
| 43.7* | All Open and Closed Excessive Force complaints Against Active or Inactive Sworn Officers who have a Complaint History with 10 or more Excessive Force Allegations filed between September 4, 2005 and September 4, 2015, covering complaint category codes 03E, 05A, 05B, 05C, 05D, 05E, 05F, 05G, 05K, 05L, 05M, 05N, 05P, 08B |

All CPD data produced in response to these requests covers complaints from January 1, 2009 up to November 9, 2016, except for the data from Set 43.7, which shows complaints from September 4, 2005 to September 4, 2015, and is marked with an asterisk above.

All datasets produced by the CPD show each relevant complaint for each CR number as a distinct spreadsheet row. Each Excel workbook produced in response to Request Numbers 44 through 49 and 51 through 53 shows, for each complaint of interest, the following data points in columns, moving left to right: the complaint category code, complaint date, the investigation ending date, the initial investigative finding, the initial discipline recommendation, the final investigative finding, and the final discipline outcome. The Excel workbook produced in dataset

8

# SEG

43.7 shows, for each complaint of interest: the incident date, the complaint date, the investigation ending date, the initial investigative finding, the initial discipline recommendation, the final investigative finding, and the final discipline outcome. Each Excel workbook produced in datasets 43.1 and 43.4 shows, for each complaint of interest, the complaint category code, the initial investigative finding, the initial discipline recommendation, the final investigative finding, and the final discipline outcome. Each Excel workbook produced in datasets 43.2, 43.3, 43.5, and 43.6 shows, for each complaint of interest, the complaint category code, the initial investigative finding, the initial discipline recommendation, the final investigative finding, and the final discipline outcome. For all datasets, I assume the complaint category codes for each complaint reflect the final category code determinations.

In the CPD-produced data (except set 43.7), the Excel workbooks present all the complaints for each CR grouped together in consecutive spreadsheet rows. Each row under a CR in the CPD Excel workbooks represents a distinct accused officer.[8] The complaint category code listed in each row was determined based on the "most heinous" of all of that accused officer's complaints in the CR;[9] therefore, the CPD-produced data does not show complaints of interest that were determined not to be the "most heinous" of all complaints made against an accused officer in the CR.[10] The CPD-produced data does not count multiple complaints against one officer in a CR.

Additionally, any officers who were not named in the official civilian complaint are not included in the CR and in the data provided by the CPD in this case.[11] Additionally, only complaints worthy of further investigation are entered into CRMS and appear in the CPD-provided data I reviewed; any complaints that were administratively closed, such as taser use, are not analyzed.[12] For these reasons, the statistical results from the CPD-produced data overstate the rate at which complaints of interest are sustained and lead to meaningful discipline for the accused officers.

For each dataset, I filtered the initial discipline recommendations and final disciplinary results by the complete list of CPD discipline codes to count and determine the rate of meaningful discipline. I conducted all of my data analysis in Microsoft Excel.

Exhibits 1 and 2 at the end of this report display the count data findings from the CPD-produced data for the initial and final investigative findings and the initial disciplinary recommendations and final discipline outcomes for accused officers for responses to Request Numbers 44 through 49 and Request Numbers 51 through 53. Exhibits 3 and 4 transform the count data from Exhibits 1 and 2 to show the rates at which complaints were sustained and meaningful discipline recommended or imposed on the accused officers for each dataset produced for Request Number 44 through 49 and 51 through 53. Exhibits 5 through 8 at the end of this report show the same statistical outcomes for datasets 43.1 and 43.4 as Exhibits 1 through 4 show for datasets 44 through 49 and 51 through 53.

---

[8] *Ibid., 60.*
[9] *Ibid., 71.*
[10] *Ibid., 79.*
[11] *Ibid., 59-60.*
[12] *Ibid., 62-63.*

Smith Economics Group, Ltd. ■ 312-943-1551

# SEG

**Statistical Tests of Significance**

In some of my analyses I use the chi-squared statistical test to determine whether the differences in proportions of sustained complaints and meaningful discipline are likely due to chance or likely due to some underlying cause. I use the 95 percent level of significance, which is the standard level of statistical significance, throughout my report. If a difference is significant, it means that, with 95 percent probability, some underlying force is causing the difference in proportions in the data being compared. If a difference is not statistically significant, than the difference in proportions is, with 95 percent probability, due to chance or random error.

**Data Findings**

Table 1 below shows the number of complaints, the number of sustained complaints, and the number of complaints that resulted in meaningful discipline ultimately being imposed on the accused officer for each type of complaint of interest, using datasets 43.1, 46, 47, 51, 52, and 53 of the CPD-produced data.

<u>Table 1</u>

Final Complaint Findings and Discipline Outcomes for Complaints of Interest, January 1, 2009 to November 9, 2016

| Complaint Type | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| Excessive Force (43.1) | 8,222 | 266 | 3.24% | 55 | 0.67% |
| Illegal Search (46) | 4,355 | 8 | 0.18% | 4 | 0.09% |
| Damage/Trespass to Property (47) | 267 | 2 | 0.75% | 1 | 0.37% |
| Neglect of Duty/Failure to Intervene (51) | 8,274 | 164 | 1.98% | 1 | 0.01% |
| Property Violations (52) | 1,781 | 28 | 1.57% | 1 | 0.06% |
| Unnecessary Use of/Display of Weapon (53) | 539 | 22 | 4.08% | 10 | 1.86% |

Table 2 below shows the initial and final investigative findings and initial discipline recommendations and final discipline outcomes for all complaints of interest combined, incorporating datasets 43.1, 46, 47, 51, and 52.

10

# SEG

---

Table 2

Complaint Findings, Initial Discipline Recommendations, and Final Discipline Outcomes for all Complaints of Interest, January 1, 2009 to November 9, 2016

| Item | Total CRs | Total Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions - 10+ Days | Terminations |
|------|-----------|------------------|----------------------|------------------------|------------------------|--------------|
| Initial Counts | 12,078 | 22,899 | 508 | 205 | 58 | 37 |
| Final Counts | 12,078 | 22,899 | 468 | 169 | 52 | 10 |
| | | | | | | |
| Initial Rates | | | 2.22% | 0.90% | 0.25% | 0.16% |
| Final Rates | | | 2.04% | 0.74% | 0.23% | 0.04% |
| | | | | | | |
| Percent Reduction, Initial to Final | | | 7.87% | 17.56% | 10.34% | 72.97% |

Table 2 shows that the initial disciplinary recommendations were reduced in nearly three-quarters (72.97 percent) of the cases in which termination was initially recommended. Further, out of 22,899 recorded complaints of interest, only 62 (52 suspensions of 10 days or more and 10 terminations) ultimately resulted in meaningful discipline for the accused officer. This is equivalent to 27 instances of meaningful discipline for every 10,000 complaints of interest or only one in 400.

Table 3 below shows the number of complaints, the number of sustained complaints, and the number of complaints that resulted in meaningful discipline imposed on the accused officer for excessive force complaints, using datasets 43.1, 43.4, 44, and 45 of the CPD-produced data.

Table 3

Final Complaint Findings and Discipline Outcomes for Excessive Force Complaints, January 1, 2009 to November 9, 2016

| Excessive Force Victim or Complainant | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---------------------------------------|------------------|----------------------|----------------|-----------------------------|----------------------------|
| Non-African-Americans (43.1 – 43.4) | 3,267 | 161 | 4.93% | 37 | 1.13% |
| All Races and Ages (43.1) | 8,222 | 266 | 3.24% | 55 | 0.67% |
| African-Americans (43.4) | 4,955 | 105 | 2.12% | 18 | 0.36% |
| Minors, All Races (44) | 1,063 | 32 | 3.01% | 4 | 0.38% |
| Young Children, All Races (45) | 47 | 0 | 0.00% | 0 | 0.00% |

11

# SEG

Table 3 contains several noteworthy findings.  Table 3 shows that excessive force complaints are less likely to be sustained and less likely to lead to meaningful discipline when the complainants are African-American, when the complainants are minors aged 0 to 17, and especially when the complainants are all young children aged 0 to 7.  Excessive force complaints with non-African-American victims or complainants are sustained 50 percent more often (4.93 percent/3.24 percent) and lead to meaningful discipline for the accused officer 70 percent more often (1.13 percent/0.67 percent) in comparison with the total population of excessive force victims and complainants.  Moreover, no excessive force complaints involving young children victims or complainants were sustained during the nearly eight-year period measured by the CPD-produced data for this case.  Only 2.12 percent of excessive force complaint allegations with African-American victims or complainants resulted in a sustained finding, with only one in 275 (0.36 percent) of these complaints leading to meaningful discipline for the accused officer.  Excessive force complaints with African-American victims are sustained only 65 percent as often (2.12 percent/3.24 percent) and lead to meaningful discipline for the accused officer only 55 percent as often (0.36 percent/0.67 percent) in comparison with the total population of excessive force victims and complainants.  For excessive force complaints, the proportion of sustained complaints and meaningful discipline for African-Americans victims or complainants is statistically significantly different from the proportion of sustained complaints and meaningful discipline of non-African-American victims and complainants.

Table 4 below shows the initial and final investigative findings and initial discipline recommendations and final discipline outcomes for excessive force complaints filed against officers with a disciplinary history of ten or more excessive force complaints during the ten-year period from September 4, 2005 to September 4, 2015, incorporating CPD-produced dataset number 43.7.  This data includes 912 unique complaints for this group of 71 officers.  Exhibit 9 at the end of this report shows the distribution of the 71 officers listed in dataset 43.7 by their number of excessive force complaints.

Smith Economics Group, Ltd. ■ 312-943-1551

# SEG

Table 4

Excessive Force Complaint Findings, Initial Discipline Recommendations, and Final Discipline Outcomes for Officers with 10 or more Excessive Force Complaints, September 4, 2005 to September 4, 2015

| Item | Excessive Force Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions - 10+ Days | Terminations |
|------|----------------------------|----------------------|------------------------|------------------------|--------------|
| Initial Counts | 912 | 27 | 10 | 9 | 4 |
| Final Counts | 912 | 26 | 10 | 7 | 0 |
| | | | | | |
| Initial Rates | | 2.96% | 1.10% | 0.99% | 0.44% |
| Final Rates | | 2.85% | 1.10% | 0.77% | 0.00% |
| | | | | | |
| Percent Reduction, Initial to Final | | 3.70% | 0% | 22.22% | 100% |

**<u>The most notable finding in Table 4 is that all four initial discipline recommendations for termination of an accused officer with 10 or more excessive force complaints were ultimately overturned, resulting in zero terminations.</u>**  Additionally, excessive force allegations against officers with 10 or more excessive force complaints were sustained at a slightly lower rate during this ten-year period than were all excessive force complaints from January 1, 2009 to November 9, 2016 (2.85 percent vs. 3.18 percent).

The CPD had 13,136 sworn/exempt staff as of the end of 2009 and 12,244 sworn/exempt staff as of September 2011.[13]  Given that dataset 43.7 has 71 officers, only about one-half of one percent of all CPD officers (71/13,136) accrued 10 or more excessive force complaints during the ten-year period from September 4, 2005 to September 4, 2015.  99.5 percent of CPD officers had nine or fewer excessive force complaints each during this ten-year period.  As discussed in Section 3 below, the mean number of all complaints per officer during a more limited period of 2013 to 2016 is 1.42, or about 0.5 per year.  Restricting to only excessive force complaints, the mean number of complaints the average CPD officer accrues over a five-year period is considerably lower than five.

## 2.  Invisible Institute Data

To test the accuracy of the data produced by CPD in this case, I have reviewed and analyzed complaint and discipline data from the Invisible Institute's Citizens Police Data Project (IICPDP) found at http://cpdb.com.  According to information found at this website, this database comes from four datasets, which cover approximately 2001 to 2008 and 2011 to 2015, and was provided by CPD in response to litigation and Freedom of Information Act (FOIA) requests.

---

[13] Chicago Police Department, 2010 Annual Report

Smith Economics Group, Ltd. ▪ 312-943-1551

# SEG

The CPD-produced datasets cover approximately 2009 through 2016. The IICPDP data only overlaps with the CPD-produced data in this case during the years 2011 to 2015. In addition to the two data sources covering different periods, it is possible that the CPD used different procedures to produce the data for the Invisible Institute FOIA requests than it did for this case. It is also possible that the Invisible Institute refined or "cleaned" the data they received from FOIA requests in ways that are unknown to us.

Table 5 below shows, based on the Invisible Institute data, the number of complaints, the number of sustained complaints, and the number of complaints that resulted in meaningful discipline imposed on the accused officer for each type of complaint of interest. The data for each of the six complaint types was found by accessing the IICPDP online database and searching allegations by complaint category code using the codes shown in Figure 1 above that correspond to the CPD-produced data in response to Request Number 43, 46, 47, 51, 52, and 53. I then filtered the data by only counting the complaints with incident dates from 2011 through 2015. The Invisible Institute data only has five damage/trespass to property complaints during the target time period from 2011 through 2015, so I have excluded this type of complaint of interest from my comparison of the Invisible Institute and CPD-produced data in this section.

Table 5

Invisible Institute Final Complaint Sustained and Discipline Rates, 2011 through 2015

| Complaint Type | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| Excessive Force | 2,868 | 43 | 1.50% | 11 | 0.38% |
| Illegal Search | 1,880 | 0 | 0.00% | 0 | 0.00% |
| Neglect of Duty/Failure to Intervene | 4,083 | 169 | 4.14% | 5 | 0.12% |
| Property Violations | 867 | 18 | 2.08% | 0 | 0.00% |
| Unnecessary Use of/Display of Weapon | 164 | 2 | 1.22% | 1 | 0.61% |

Charts 1 through 3 below allow us to compare and contrast, for complaints of interest, the CPD and IICPDP data with respect to these data points: the number of allegations, the rate of sustained allegations, and the rate of allegations leading to meaningful discipline. This comparison is made understanding the different periods that the two datasets cover, with only the four years in common being compared in Table 5 above.

14

# SEG

<u>Chart 1</u>

Number of Allegations by Complaint of Interest Type



Chart 1 shows that, for each complaint of interest, the number of Invisible Institute complaints is less than half the number of CPD-produced complaints. This is unsurprising given the shorter period covered by the Invisible Institute data.

15

# SEG

Chart 2

Percentage of Allegations Sustained by Complaint of Interest Type



Chart 2 shows that excessive force complaints in the Invisible Institute data are sustained at a rate of less than half (1.50 percent/3.24 percent) of the rate that excessive force complaints were sustained in the CPD-produced data. Again, the differences in the results in Chart 2 are most likely explained by the significant difference in periods covered by the two data sources.

16

# SEG

---

## Chart 3

Percentage of Allegations Resulting in Meaningful Discipline by Complaint of Interest Type



According to both data sources, fewer than 3 out of 1,000 complaints of interest (0.27 percent in CPD data and 0.19 percent in IICPDP data) resulted in meaningful discipline imposed on the accused officer.

17

Smith Economics Group, Ltd. ▪ 312-943-1551

# SEG

Graphs 1 through 3 show significant consistencies between the CPD-produced data and the Invisible Institute data in terms of final investigative findings and final discipline outcomes for various complaint of interest types. It appears that the CPD-produced data is reasonably consistent with the Invisible Institute data across the various complaint types.

As discussed above, according to the CPD-produced data (Table 3), only 2.12 percent of excessive force complaint allegations with African-American victims resulted in a sustained finding, with only one in 275 (0.36 percent) of these complaints leading to meaningful discipline for the accused officer. Excessive force complaints with African-American victims are sustained only 65 percent as often (2.12 percent/3.24 percent) and lead to meaningful discipline for the accused officer only 55 percent as often (0.36 percent/0.67 percent) in comparison with the total population of excessive force victims and complainants.

Tables 6 and 7 below provide an overview of the quantity and disposition of citizen complaints in the Invisible Institute database, broken down by the race of complainants.

## Table 6

IICPDP Final Complaint Investigative and Discipline Data – All Complaint Types, 2001 through 2008 and 2011 through 2015

| Race | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| White | 4,619 | 455 | 9.85% | 44 | 0.95% |
| Black | 16,080 | 198 | 1.23% | 21 | 0.13% |

Table 6 shows that the meaningful discipline rate for complaints with African-American complainants is one-seventh (0.13 percent/0.95 percent) of that for complaints with White complainants. For all complaints, the proportion of sustained complaints and meaningful discipline for African-Americans complainants is statistically significantly different from the proportion of sustained complaints and meaningful discipline of non-African-American complainants.

18

Smith Economics Group, Ltd. ■ 312-943-1551

# SEG

Table 7

IICPDP Final Complaint Investigative and Discipline Data – Excessive Force Complaints, 2001 through 2008 and 2011 through 2015

| Race | Excessive Force Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| White | 291 | 30 | 10.31% | 4 | 1.37% |
| Black | 1,781 | 8 | 0.45% | 2 | 0.11% |

The Invisible Institute data shows that African-American citizens file many more complaints of all types, including excessive force complaints, than White citizens. Further, excessive force complaints filed by African-American citizens are one-twentieth as likely (0.45 percent/10.31 percent) to be sustained and one-twelfth as likely (0.11 percent/1.37 percent) to lead to meaningful discipline imposed on the accused officer compared with excessive force complaints filed by White citizens. For excessive force complaints, the proportion of sustained complaints and meaningful discipline for African-Americans complainants is statistically significantly different from the proportion of sustained complaints and meaningful discipline of non-African-American complainants.

The Invisible Institute data also shows that African-American excessive force complainants have a sustained complaint rate that is approximately one-fifth (0.45 percent/2.12 percent) of that of the CPD-produced data provided in Set 43.4 (Table 3) and a meaningful discipline rate that is approximately one-third (0.11 percent/0.36 percent) of that of the corresponding rates from the CPD-produced data. Again, this discrepancy between the two data sources is likely explained by the different periods covered.

### 3. Analysis of Complaint Data for Officers Involved in Simmons Incident

Table 8 below shows the distribution of all complaints against CPD officers according to the complaints-cpd-june2016 dataset (hereafter referred to as the '8/13 - 6/16 Invisible Institute data') found at https://github.com/invinst/chicago-police-data. This dataset contains records of complaints against police officers obtained from CPD in June 2016 *via* a FOIA request. This dataset covers complaints filed between August 2013 (beginning with CRID# 1038595) and June 2016 (ending with CRID# 1080904). The 8/13 – 6/16 Invisible Institute data only show the 7,352 accused officers who were the subject of complaints filed during this period. I estimate the number of officers without any complaints in the June 2011 dataset by assuming there were 13,000 total CPD officers during this period, based on the number of officers listed in the CPD's 2010 Annual Report.[14] Based on this, the median number of complaints per officer during this period is 1.00 and the mean number of complaints per officer is 1.42.

---

[14] Chicago Police Department, 2010 Annual Report

19

# SEG

Table 8

Distribution of All CPD Complaints, August 2013 to June 2016

| Number of Complaints | Number of Officers | Total Complaints | Percent of Total Officers | Cumulative Percent of Total Officers | Percent of Total Complaints |
|---|---|---|---|---|---|
| 0 | 5,648 | 0 | 43.45% | 43.45% | 0.00% |
| 1-2 | 4,885 | 6,613 | 37.58% | 81.02% | 35.95% |
| 3-5 | 1,842 | 6,693 | 14.17% | 95.19% | 36.38% |
| 6-10 | 530 | 3,815 | 4.08% | 99.27% | 20.74% |
| 11-15 | 77 | 956 | 0.59% | 99.86% | 5.20% |
| 16-20 | 16 | 274 | 0.12% | 99.98% | 1.49% |
| 21-25 | 2 | 45 | 0.02% | 100.00% | 0.24% |
| 26+ | 0 | 0 | 0.00% | 100.00% | 0.00% |
| Total | 13,000 | 18,396 | 100.00% | | 100.00% |

Table 9 below shows the total number of complaints for the defendant officers during this period according to the same 8/13 – 6/16 Invisible Institute data. Table 9 also shows the number of complaints in the defendant officers' history to February 27, 2017, as well as the average number of complaints filed against them per year throughout their entire careers.[15]

Table 9

Defendant Officers' Complaint History

| Officer | Appointment Date | 8/13 – 6/16 Complaints | Total Career Complaints | Avg Complaints per Year |
|---|---|---|---|---|
| Anthony Babicz | 9/27/2004 | 14 | 33 | 2.66 |
| Steven Hefel | 5/1/2006 | 14 | 37 | 3.42 |
| Justin Homer | 12/5/2005 | 16 | 31 | 2.76 |
| Brian Kinnane | 4/30/2001 | 7 | 33 | 2.08 |
| Michael Laurie | 1/26/2004 | 11 | 25 | 1.91 |
| John Okeefe | 10/28/2002 | 7 | 31 | 2.16 |
| Michael Suing | 4/26/2004 | 9 | 33 | 2.57 |
| John Wrigley | 7/29/2002 | 6 | 22 | 1.51 |
| Average | | 11 | 31 | 2.38 |
| Total | | 84 | 245 | 21.45 |

---

[15] CITY-AS-018162 – CITY-AS-018175

# SEG

According to Tables 8 and 9, **all eight defendant officers received more complaints during this period than at least 95 percent of CPD officers, and four of the eight defendant officers received more complaints during this period than 99 percent of CPD officers**.  It is virtually statistically impossible to select eight CPD officers at random who have collectively received as many complaints during this period as the defendant officers.

Further, of the 245 total complaints filed against the eight defendant officers throughout their careers, only two complaints have ever been sustained.[16]  John Wrigley was the accused officer on each of these two occasions, and he received a one-day suspension for a "conduct unbecoming" violation (CRID# 1001185) and a ten-day suspension for a "false arrest" violation (CRID# 1005749).  None of the defendant officers' other 243 complaints ultimately resulted in any discipline.

In addition to reviewing the disciplinary histories of the eight defendant officers, I have also reviewed the names and disciplinary histories of 12 CPD officers who were former defendants in other civil cases where the City paid out money after a settlement or jury verdict to the family of a minor victim of excessive force.  Table 10 below shows the number of complaints these 12 other former defendant officers have received according to the 8/13 – 6/16 Invisible Institute dataset and their full disciplinary histories.[17]

Table 10

Other Defendant Officers' Complaint History

| Officer | Appointment Date | June 2016 Complaints | Total Career Complaints | Avg Complaints per Year |
|---|---|---|---|---|
| Sean Brandon | 8/7/1995 | 4 | 39 | 1.81 |
| Glenn Evans | 7/14/1986 | 16 | 135 | 4.41 |
| Kevin Fry | 9/29/2003 | 11 | 35 | 2.61 |
| Robert Gonzalez | 12/14/1998 | 5 | 28 | 1.54 |
| Darryl Hardy | 8/25/2005 | 1 | 9 | 0.78 |
| Jose Lopez | 2/6/1995 | 16 | 50 | 2.27 |
| Kerry Pozulp | 10/31/2005 | 5 | 20 | 1.77 |
| Frank Ramaglia | 10/13/1998 | 8 | 46 | 2.50 |
| Chris Skarupinski | 10/29/2007 | 4 | 12 | 1.29 |
| Robert Stegmiller | 7/10/1995 | 7 | 55 | 2.54 |
| Jason Van Dyke | 6/25/2001 | 7 | 26 | 1.66 |
| Darren Wright | 12/4/1995 | 1 | 14 | 0.66 |
| Average | | 7 | 39 | 1.99 |
| Total | | 85 | 469 | 23.83 |

---

[16] CITY-AS-018162 – CITY-AS-018175
[17] CITY-AS-015302 – CITY-AS-015324

21

# SEG

The defendant officers in this case have received about 20 percent more complaints per year on average throughout their careers than the officers in Table 10 who cost the City money in civil litigation, settlements and judgments in cases in which the allegations were similar to this case. Further, according to the Invisible Institute data, the defendant officers in this case received about 50 percent more complaints on average from August 2013 to June 2016 than did the officers in Table 10.

This data shows that the CPD could have used the complaint records of the defendant officers in Table 10 who have cost the City money in jury verdicts and settlements for excessive force against minors as a basis for tracking officers at risk of being accused of serious misconduct. But the CPD's early invention systems did not track the number of complaints accrued by a unit to identify a pattern of potential misconduct.[18] Such a system could have identified the defendant officers as being a potential financial risk to the City and a potential excessive force risk to its residents.

### 4. Analysis of Complaint Data for 11th District

Ms. Simmons' home is located in the territory covered by CPD's 11th District. Table 11 below shows the dispositions of excessive force complaints and all other complaints of interest for alleged misconduct occurring in the 11th District according to the IICPDP data covering the period from 2011 to 2015.

Table 11

IICPDP 11th District Complaints of Interest, 2011 to 2015

| Complaint Type | Total Complaints | Sustained Complaints | Sustained Rate | Total Meaningful Discipline | Meaningful Discipline Rate |
|---|---|---|---|---|---|
| Excessive Force | 217 | 0 | 0.00% | 0 | 0.00% |
| Other Complaints of Interest | 469 | 11 | 2.35% | 0 | 0.00% |
| All Complaints of Interest | 686 | 11 | 1.60% | 0 | 0.00% |

Table 11 shows that zero of the 686 complaints of interest in the 11th district led to meaningful discipline imposed on the accused officers in the 11th District. Table 12 below shows the race of the complainants in complaints of interest that came from the 11th District.

---

[18] O'Neill Deposition, p. 90-91.

22

# SEG

Table 12

IICPDP 11th District Complaining Witnesses for Complaints of Interest, 2011 to 2015

| Race | Complaining Witnesses | Sustained Complaints | Percent of Complaining Witnesses with Complaints Sustained |
|---|---|---|---|
| Black | 281 | 5 | 1.78% |
| Non-Black | 49 | 7 | 14.29% |

The data in Table 12 show that race is a significant factor in whether complaints of interest in the 11th District are sustained: African-American complainants were only about one-eighth as likely (1.78%/14.29%) to have their complaints sustained as non-African-American complainants.

Based on all the data I have reviewed, it is clear that throughout the entire city there is a very low probability (Tables 3, 6, 12) that a complaint filed by an African-American victim will be sustained. Further, even if an excessive force complaint is sustained, the probability that any meaningful discipline will be imposed on the accused officer, such as a suspension of ten days or more or termination from the department, is less than 1 in 200 (Tables 3 and 7). Only six of more than two thousand excessive force complaints (0.3 percent) in the Invisible Institute data with White or Black victims resulted in meaningful discipline for the accused officers (Table 7). Any action by an officer resulting in an excessive force complaint is extraordinarily unlikely to lead to a negative consequence for the accused officer; the eight defendant officers accused of taking part in the incidents in this case would have known this from their personal experiences and from those of their fellow officers.

In contrast to the CPD data above, for the ten years from 2006 through 2015 the New York City Civilian Complaint Review Board substantiated 6.90 percent of 55,247 excessive force complaints. This is more than double and more than four times, respectively, the rate that excessive force complaints were sustained against CPD officers based on the CPD-produced and Invisible Institute datasets (Tables 3 and 5).[19] Additionally, excessive force complaints made against officers at large municipal police departments with 1,000 or more full-time sworn officers are sustained at a rate of six percent nationally, which is consistent with the New York data.[20] Thus, the CPD's low rate of sustained complaints and even lower rate of meaningful discipline is in stark contrast to large municipal police departments nationwide.

---

[19]  Based on information found at www1.nyc.gov/ccrb/policy

[20]  Citizen Complaints about Police Use of Force; Department of Justice Special Report, June 2006 (Revised October 27, 2016), NCJ 210296..

Smith Economics Group, Ltd. ■ 312-943-1551

# SEG

*5. CPD Behavioral Intervention Programs*

According to Donald J. O'Neill, CPD has several early intervention systems, including the Non-Disciplinary Intervention Program (NDI), the Behavioral Intervention System (BIS), and the Personnel Concerns Program (PC).  Only the most recent seven years of sustained or non-sustained excessive force complaints and only the most recent five years of sustained or not sustained other complaints were permitted to be used to determine which officers to recommend for participation in the BIS and PC programs.[21]  NDI is the least intrusive monitoring program, and PC is the most severe monitoring program.  IPRA recommends officers for NDI to the CPD's Human Resources department.[22]  If HR decides against recommending the accused officer for an NDI, IPRA will then give the complaint a CR number.[23]  Therefore, any citizen complaints that resulted in NDI are not included in the CPD-produced data or the Invisible Institute data.  These are potential complaints of interest that did not lead to meaningful discipline for the accused officers.  Table 13 below shows the number of officers enrolled in the NDI, BIS, and PC early intervention systems in recent years.[24]  Table 13 shows that the number of CPD officers enrolled in these programs has declined by about 80 to 90 percent from 2007 to 2015.

Table 13
Behavioral Intervention Program Enrollees, 2007-2015

| Year | NDI | BIS | PC |
|---|---|---|---|
| 2007 | 717 | 93 | 12 |
| 2008 | 407 | 44 | 5 |
| 2009 | 421 | 19 | 2 |
| 2010 | 384 | 11 | 0 |
| 2011 | 215 | 13 | 0 |
| 2012 | 238 | 9 | 2 |
| 2013 | 255 | 1 | 0 |
| 2014 | 176 | 8 | 0 |
| 2015 | 144 | 13 | 1 |
| 2007-2015 Decrease | 79.92% | 86.02% | 91.67% |

---

[21] O'Neill Deposition, p. 41-43.
[22] *Ibid., 161-162.*
[23] *Ibid., 163.*
[24] *Ibid., 165-167, 181-184.*

24

# SEG

## V. DISCUSSION

The above sections 1 through 4 analyze data on civilian complaint dispositions. The complaints from which the data are derived represent events documented by civilian complainants in which CPD officers allegedly committed violations. However, the U.S. Department of Justice found that not all victims of excessive force file formal complaints; "estimates from the 2002 Police-Public Contact Survey indicated that although 75% of citizens experiencing force thought the level of force used was excessive, about 10% filed a complaint with the agency employing the officer(s)."[25] Further, among civilians who felt police officers behaved improperly during involuntary contacts, 4.4 percent filed complaints from police traffic stops, and 2.8 percent filed complaints from police street stops.[26] Based on these figures, it is reasonable to assume that only about one-out-of-twenty to one-out-of-ten victims of excessive police force file formal complaints. Therefore, based on the data in Table 3, we can estimate that there were approximately 82,000 to 164,000 instances of police use of excessive force from January 1, 2009 through November 8, 2016, of which number only 261 complaints resulted in sustained findings and only 57 resulted in meaningful discipline for the accused officer, according to the CPD-produced data in Set 43.1. Therefore, for every 10,000 excessive force complaints, only about 16 to 32 will result in a sustained investigative finding and only 3 to 7 will result in meaningful discipline for the accused officer.

Additionally, as noted before, whereas a citizen can make multiple complaints against an officer for multiple types of misconduct, each CR only shows one complaint of interest for each accused officer. In addition, unnamed officers are not included in the CR data that I analyzed. Therefore, even these extraordinarily low discipline statistics greatly overstate the odds that a citizen complaint will result in meaningful discipline for the accused officer. In his Data Analysis Memo for *Padilla v. City of Chicago* dated June 21, 2012, Dr. Steven Whitman made data-driven estimates that the effect of each of these discrepancies is to reduce the number of complaints he analyzed by a factor of two.[27] Using these data-driven estimates here, for every 10,000 excessive force complaints, only about 4 to 8 will result in a sustained investigative finding, and only 1 to 2 will result in meaningful discipline for the accused CPD officer. **These rates are very near to zero.**

In other words, any given excessive force complaint had almost no chance of leading to meaningful discipline for the accused officer. The odds of meaningful discipline were even lower if the victim is African-American. It is, therefore, a statistical reality that Chicago police officers, including the defendant officers in this case, could use excessive force against citizens with a near zero chance of any significant consequence.

Moreover, even if an investigation results in a sustained finding and a recommendation of meaningful discipline, many layers of CPD review must be cleared before decisions become

---

[25] Citizen Complaints about Police Use of Force; Department of Justice Special Report, June 2006 (Revised October 27, 2016), NCJ 210296..

[26] Police Behavior during Traffic and Street Stops, 2011; Department of Justice Special Report, September 2013, NCJ 242937.

[27] Data Analysis Memo for Padilla v. City of Chicago, p 7.

# SEG

final, and discipline can be imposed and served.[28]  Even when a suspension is ultimately imposed, "an officer can serve the suspension by using paid vacation or furlough days, resulting in no loss of income to the officer."[29]

Moreover, if an IPRA investigation recommends discipline but does not recommend discharging the officer, then there is also a Command Channel Review (CCR) process "in which supervisors in the accused officer's chain of command review and comment on the recommended discipline."[30]  The CCR comments and recommendations are forwarded to the Superintendent for review, along with the IPRA's final findings and recommendations.  "If the Superintendent approves the recommendations, the decision is final, but if not, it is subject to another process before the Chicago Police Board."[31]  The Police Board tends to uphold the Superintendent's discharge recommendations in only about 40 percent of cases.[32]  Further, the Board found "not guilty" in six cases it heard in 2014, "thus going beyond refusing to discharge to wiping the slate entirely clean in another 37% of the cases in which the Superintendent had sought to discharge an officer."[33]

Further, we note that "… other than in discharge cases, which are heard only by the Police Board, officers also can challenge final CPD discipline decisions through arbitration…" and "Decisions of the Police Board and arbitrators are subject to administrative review in the Circuit Court of Cook County and can then be appealed to the Illinois Appellate Court and the Illinois Supreme Court."[34]  According to the report of the Police Accountability Task Force, "… in 2015, arbitrators reduced disciplinary recommendations in 56.4% of cases and eliminated any discipline in 16.1% of cases.  In total, arbitrators reduced or eliminated discipline in 73% of cases."[35]

Mediation is another tool "used by IPRA to resolve an allegation of misconduct, usually by having the officer agree to a sustained finding in exchange for reduced punishment.  Mediation is always used before investigations are complete, including before the accused officer is ever interviewed."[36]  In fact, "from 2013 through 2015, mediations accounted for approximately 65% of all sustained cases…In addition to mediation often leading to lesser disciplinary penalties, agreeing to mediate a misconduct complaint also allows officers to accept a sustained finding on a less serious charge in exchange for the IPRA investigator dropping more serious charges from the complaint file."[37]

---

[28] *Investigation of the Chicago Police Department*; United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois, p. 80

[29] *Ibid., 81.*

[30]  *Ibid.*, 49.

[31] *Ibid.*

[32] *Ibid., 86-87.*

[33] *Ibid.*

[34] *Ibid.*

[35] *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve*; Police Accountability Task Force, p. 11.

[36] *Ibid., 54.*

[37] *Ibid., 55.*

# SEG

---

Recent investigations have revealed the CPD's shortcomings in holding accused officers accountable for their misconduct.  The U.S. Department of Justice issued a report on January 13, 2017 based on its investigation of the CPD and IPRA.  The report concludes that the investigators "found reasonable cause to believe that CPD has engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment *and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice*" (emphasis added).[38]  The investigation also found that "the City fails to conduct any investigation of nearly half of police misconduct complaints and that a number of institutional barriers contribute to this fact" and that "investigations foundered because of the pervasive cover-up culture among CPD officers, which the accountability entities accept as an immutable fact rather than something to root out."[39]  The Justice Department also concludes that "a code of silence exists, and officers and community members know about it."[40]

The report of CPD's Police Accountability Task Force comes to a similar conclusion: "these statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself."[41]


## VI.  SUMMARY

It is my opinion that the data analyzed show a high statistical likelihood of a "code of silence" within the Chicago Police Department, and a failure to investigate and discipline CPD officers for misconduct, such as the use of excessive force, against citizens.  The data I have reviewed indicates that, during the time covered by the CPD-produced data in this case, CPD officers could use excessive force and commit other misconduct against citizens virtually with impunity.

---------------------------------------

---

[38] *Ibid.,* 23.
[39] *Ibid., 47.*
[40] *Ibid., 75.*
[41] *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve*; Police Accountability Task Force, p. 12.

Smith Economics Group, Ltd. ▪  312-943-1551

# SEG

If additional information is provided to me, which could alter my opinions, I may incorporate any such information into an update, revision, addendum, or supplement of the opinions expressed in this report.

If you have any questions, please do not hesitate to call me.

Sincerely,

Stan V. Smith, Ph.D.
President

Smith Economics Group, Ltd. ▪ 312-943-1551

# SEG

## **Appendix**

### Exhibit 1

Initial Complaint Findings and Initial Discipline Recommendations, January 1, 2009 to November 9, 2016

| Complaint Type | Total CRs | Total Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions – 10+ Days | Terminations |
|---|---|---|---|---|---|---|
| Excessive Force with Minors (44) | 636 | 1,063 | 35 | 12 | 6 | 0 |
| Excessive Force with Young Children (45) | 21 | 47 | 3 | 1 | 2 | 0 |
| Illegal Search (46) | 1,567 | 4,355 | 10 | 4 | 3 | 0 |
| Damage/ Trespass to Property (47) | 36 | 267 | 4 | 0 | 2 | 0 |
| All Complaints with Minors (48) | 1,277 | 2,437 | 59 | 19 | 7 | 2 |
| All Complaints with Young Children (49) | 76 | 166 | 9 | 1 | 2 | 0 |
| Neglect of Duty/Failure to Intervene (51) | 4,623 | 8,274 | 197 | 91 | 6 | 3 |
| Unconstitutional Seizure of Property (52) | 912 | 1,781 | 31 | 8 | 0 | 2 |
| Unnecessary Use of/Display of Weapon (53) | 309 | 539 | 26 | 4 | 5 | 12 |

29

# SEG

---

<u>Exhibit 2</u>

Final Complaint Findings and Final Discipline Outcomes, January 1, 2009 to November 9, 2016

| Complaint Type | Total CRs | Total Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions – 10+ Days | Terminations |
|---|---|---|---|---|---|---|
| Excessive Force with Minors (44) | 636 | 1,063 | 32 | 8 | 4 | 0 |
| Excessive Force with Young Children (45) | 21 | 47 | 0 | 0 | 0 | 0 |
| Illegal Search (46) | 1,567 | 4,355 | 8 | 1 | 4 | 0 |
| Damage/ Trespass to Property (47) | 36 | 267 | 2 | 1 | 1 | 0 |
| All Complaints with Minors (48) | 1,277 | 2,437 | 58 | 12 | 4 | 2 |
| All Complaints with Young Children (49) | 76 | 166 | 8 | 2 | 0 | 0 |
| Neglect of Duty/Failure to Intervene (51) | 4,623 | 8,274 | 164 | 68 | 1 | 0 |
| Unconstitutional Seizure of Property (52) | 912 | 1,781 | 28 | 5 | 0 | 1 |
| Unnecessary Use of/Display of Weapon (53) | 309 | 539 | 22 | 2 | 7 | 3 |

30

# SEG

---

<u>Exhibit 3</u>

Initial Complaint Findings and Initial Discipline Recommendations, January 1, 2009 to November 9, 2016

| <u>Complaint Type</u> | <u>Percentage Sustained</u> | <u>Percentage 1-9 Day Suspensions</u> | <u>Percentage 10+ Day Suspensions</u> | <u>Percentage Terminated</u> |
|---|---|---|---|---|
| Excessive Force with Minors (44) | 3.29% | 1.13% | 0.56% | 0.00% |
| Excessive Force with Young Children (45) | 6.38% | 2.13% | 4.26% | 0.00% |
| Illegal Search (46) | 0.23% | 0.09% | 0.07% | 0.00% |
| Damage/ Trespass to Property (47) | 1.50% | 0.00% | 0.75% | 0.00% |
| All Complaints with Minors (48) | 2.42% | 0.78% | 0.29% | 0.08% |
| All Complaints with Young Children (49) | 5.42% | 0.60% | 1.20% | 0.00% |
| Neglect of Duty/Failure to Intervene (51) | 2.38% | 1.10% | 0.07% | 0.04% |
| Unconstitutional Seizure of Property (52) | 1.74% | 0.45% | 0.00% | 0.11% |
| Unnecessary Use of/Display of Weapon (53) | 4.82% | 0.74% | 0.93% | 2.23% |

31

# SEG

Exhibit 4

Final Complaint Findings and Final Discipline Outcomes, January 1, 2009 to November 9, 2016

| Complaint Type | Percentage Sustained | Percentage 1-9 Day Suspensions | Percentage 10+ Day Suspensions | Percentage Terminated |
|---|---|---|---|---|
| Excessive Force with Minors (44) | 3.01% | 0.75% | 0.38% | 0.00% |
| Excessive Force with Young Children (45) | 0.00% | 0.00% | 0.00% | 0.00% |
| Illegal Search (46) | 0.18% | 0.02% | 0.09% | 0.00% |
| Damage/ Trespass to Property (47) | 0.75% | 0.37% | 0.37% | 0.00% |
| All Complaints with Minors (48) | 2.38% | 0.49% | 0.16% | 0.08% |
| All Complaints with Young Children (49) | 4.82% | 1.20% | 0.00% | 0.00% |
| Neglect of Duty/Failure to Intervene (51) | 1.98% | 0.82% | 0.01% | 0.00% |
| Unconstitutional Seizure of Property (52) | 1.57% | 0.28% | 0.00% | 0.06% |
| Unnecessary Use of/Display of Weapon (53) | 4.08% | 0.37% | 1.30% | 0.56% |

Smith Economics Group, Ltd. ▪ 312-943-1551

# SEG

---

Exhibit 5

Initial Complaint Findings and Initial Discipline Recommendations, January 1, 2009 to November 9, 2016

| Complaint Type | Total CRs | Total Complaints | Sustained Complains | Suspensions – 1-9 Days | Suspensions – 10+ Days | Terminations |
|---|---|---|---|---|---|---|
| Excessive Force, All Races (43.1) | 4,940 | 8,222 | 266 | 102 | 47 | 32 |
| Excessive Force, African-Americans (43.4) | 2,868 | 4,955 | 99 | 37 | 11 | 15 |

Exhibit 6

Final Complaint Findings and Final Discipline Outcomes, January 1, 2009 to November 9, 2016

| Complaint Type | Total CRs | Total Complaints | Sustained Complaints | Suspensions – 1-9 Days | Suspensions – 10+ Days | Terminations |
|---|---|---|---|---|---|---|
| Excessive Force, All Races (43.1) | 4,940 | 8,222 | 266 | 94 | 46 | 9 |
| Excessive Force, African-Americans (43.4) | 2,868 | 4,955 | 105 | 35 | 16 | 2 |

33

# SEG

---

Exhibit 7

Excessive Force Complaint Findings and Initial Discipline Recommendations, January 1, 2009 to November 9, 2016

| Complaint Type | Percentage Sustained | Percentage 1-9 Day Suspensions | Percentage 10+ Day Suspensions | Percentage Terminated |
|---|---|---|---|---|
| Excessive Force, All Races (43.1) | 3.24% | 1.24% | 0.55% | 0.39% |
| Excessive Force, African-Americans (43.4) | 2.00% | 0.75% | 0.22% | 0.30% |

Exhibit 8

Excessive Force Complaint Findings and Final Discipline Outcomes, January 1, 2009 to November 9, 2016

| Complaint Type | Percentage Sustained | Percentage 1-9 Day Suspensions | Percentage 10+ Day Suspensions | Percentage Terminated |
|---|---|---|---|---|
| Excessive Force, All Races (43.1) | 3.24% | 1.14% | 0.56% | 0.11% |
| Excessive Force, African-Americans (43.4) | 2.12% | 0.71% | 0.32% | 0.04% |

34

# SEG

---

<u>Exhibit 9</u>

Distribution of CPD Officers with 10 or more Excessive Force Complaints, September 4, 2005 to September 4, 2015



# SEG

---

Exhibit 10

Invisible Institute Final Complaint Findings and Final Discipline Outcomes, 2011 through 2015

| Complaint Type | Total Complaints | Sustained Complaints | Suspensions – 10+ Days | Terminations |
|---|---|---|---|---|
| Excessive Force | 2,868 | 43 | 9 | 2 |
| Illegal Force | 1,880 | 0 | 0 | 0 |
| Damage/Trepass to Property | 5 | 2 | 1 | 0 |
| Neglect of Duty/Failure to Intervene | 4,083 | 169 | 5 | 0 |
| Property Violations | 867 | 18 | 0 | 0 |
| Unnecessary Use of/Display of Weapon | 164 | 2 | 1 | 0 |

Smith Economics Group, Ltd. ▪ 312-943-1551