## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JULISSA GREEN, on behalf of her minor child, DANASHA MCCRORY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 22-cv-02918 |
| v. | ) ) | Judge Andrea R. Wood |
| THE CITY OF CHICAGO, et al., | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 29, 2015, Chicago Police Department ("CPD") officers obtained a search warrant for a residence based on a tip from a John Doe informant. The officers executed the warrant the same day. During the search, officers handcuffed Julissa Green and held her at gunpoint, along with her minor child, Danasha McCrory, and her minor grandchild, Baylie Bell.[1] Several years later, Green filed suit on behalf of McCrory and Bell, asserting claims under federal and state law against the officers involved in obtaining the warrant and executing the search (collectively, "Officer Defendants").[2] In addition, Plaintiffs assert a claim against the City of Chicago ("City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Before the Court are three motions: Officer Defendants' motion to dismiss five claims (Dkt. No. 36), the City's motion to dismiss the *Monell* claim (Dkt. No. 37), and Defendants' joint motion to

---

[1] For purposes of this opinion, the Court refers to Green, McCrory, and Bell collectively as "Plaintiffs."

[2] The Officer Defendants include Anthony Ceja, Joseph Deferville, Rosa Elizondo, Keith Harris, Michael Joliff-Blake, Ranita Mitchell, Lenny Pierri, Vincent Stinar, Anthony Varcheto, and Joshua Wallace. There is also one unnamed Officer Defendant, an unknown CPD lieutenant.

bifurcate the proceedings (Dkt. No. 39). For the reasons set forth below, the motions to dismiss are each granted in part and denied in part, and the motion to bifurcate is denied.

## BACKGROUND

The following facts are drawn from Plaintiffs' First Amended Complaint ("FAC"). (Dkt. No. 33.) For purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the FAC as true and views those facts in the light most favorable to Plaintiffs. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as follows.

### I.  The Warrant

On September 29, 2015, Officer Defendant Stinar, under the supervision of Officer Defendant Wallace, obtained a search warrant for 1127 North Mayfield Avenue in Chicago. (FAC ¶ 44.) The Warrant Complaint relied on a tip from a John Doe about a firearm he claimed to have observed in the residence. (*Id.* ¶ 45; *see also* Pls.' Resp. Br., Ex. B ("Warrant Complaint"), Dkt. No. 65-2).[3] Although Stinar submitted the Warrant Complaint, including the accompanying affidavit regarding probable cause, all Officer Defendants "assisted in the search warrant investigation." (FAC ¶ 16; Warrant Complaint at 1–2.)[4]

---

[3] "A district court may consider documents attached to a motion to dismiss if the documents are referenced in the plaintiffs' complaint and are central to the claim." *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022). Courts have further permitted the incorporation of documents filed during motion-to-dismiss briefing. *See Sterlinski v. Cath. Bishop of Chi.*, 203 F. Supp. 3d 908, 911 n.3 (N.D. Ill. 2016). The Warrant Complaint, attached to Plaintiffs' response brief, is central to their claims, so the Court considers it here. Also, the City's reply brief attaches two reports that the FAC references extensively: a 2017 Department of Justice Report (City's Reply Br., Ex. A ("DOJ Report"), Dkt. No. 70-1) and a 2016 Police Accountability Task Force Report (City's Reply Br., Ex. B ("PATF Report"), Dkt. No. 70-2). The Court considers those documents too.

[4] According to the FAC, Plaintiffs have been unable to identify the lieutenant who approved the Warrant Complaint. (FAC ¶ 16 & n.1.) Plaintiffs allege that this person exists and is identifiable or, alternatively, that Officer Defendants applied for the search warrant without a lieutenant's approval. (*Id.* ¶¶ 56–57.)

In his affidavit, Stinar described John Doe's tip that Tarvey Green[5] showed him a pistol while they were smoking marijuana at the target residence within the last 48 hours. (Warrant Complaint at 1.) John Doe recounted that Tarvey said the gun was "for the mafias" before putting it into a bag and storing it in his bedroom closet. (*Id.*) Stinar also stated that he independently obtained Tarvey's criminal history and discovered that Tarvey did not have a valid Firearm Owners Identification ("FOID") card. (*Id.*) Further, John Doe identified Tarvey from a photograph and pointed out 1127 North Mayfield Avenue as Tarvey's house when he and Stinar drove past it. (*Id.* at 1–2.) Stinar's affidavit adds that John Doe was presented to the issuing judge, who was informed of John Doe's criminal history. (*Id.* at 2.) John Doe swore to the contents of the complaint, and the judge was able to ask him questions. (*Id.*)

Plaintiffs allege that neither Stinar nor any other Officer Defendant performed an independent investigation to determine whether Tarvey in fact had a firearm. (FAC ¶ 52.) Instead, they simply accepted John Doe's representations as true. (*Id.* ¶ 53.) According to the FAC, this lack of corroboration violated CPD policy. (*Id.* ¶¶ 52–53.) For one thing, CPD officers are trained to be skeptical of information provided by a John Doe informant. (*Id.* ¶ 46.) In addition, this particular John Doe had an extensive criminal history and was an admitted felon. (*Id.* ¶¶ 46, 48.) Nonetheless, Officer Defendants successfully obtained the search warrant the same day they applied for it. (*Id.* ¶ 44.)

## II.    The Search

At roughly 10:00 pm on September 29, 2015, Officer Defendants executed the search warrant. (*Id.* ¶¶ 16, 60.) Dressed in plain clothes with CPD vests and with guns drawn, they

---

[5] For purposes of this opinion, the Court refers to Tarvey Green as "Tarvey" and Julissa Green as "Green."

forcibly kicked down Green's front door without knocking or announcing their presence. (*Id.* ¶ 61.) All but one Officer Defendant wore black face masks resembling balaclavas. (*Id.* ¶ 68.)

Officer Defendants ordered Green to sit on the couch and handcuffed her. (*Id.* ¶ 64.) Then, they retrieved Baylie Bell, Green's three-year-old granddaughter, from the room where she had been sleeping and placed her in Green's arms. (*Id.* ¶¶ 12, 65.) An Officer Defendant kept his gun trained on Green and Bell for between fifteen and twenty minutes. (*Id.* ¶ 67.) Officer Defendants would not show Green the search warrant nor did they identify themselves by names or star numbers. (*Id.* ¶¶ 69, 79–80.) While Green held Bell, she asked questions of Officer Defendants; in response, they told her to "shut up," using the n-word towards her. (*Id.* ¶¶ 79–81.)

Green's eight-year-old daughter, Danasha McCrory, was in her bedroom when Officer Defendants entered. (*Id.* ¶¶ 11, 70.) An Officer Defendant found her and briefly brought Green back to her bedroom to confirm McCrory's identity. (*Id.* ¶ 71.) The Officer Defendant pointed his gun at McCrory for several minutes, and she was ordered to stay in her bedroom, far from her mother in the living room. (*Id.* ¶¶ 71–72.) An armed Officer Defendant remained by her room. (*Id.* ¶ 73.) While she was inside, Officer Defendants searched her room, breaking the bedroom door in the process. (*Id.* ¶ 75.)

Bell and McCrory, along with Green, were detained for the entire two-hour search. (*Id.* ¶ 87.) Throughout the encounter, they were compliant, followed instructions, and did not present a threat. (*Id.* ¶ 91.) Still, all Officer Defendants repeatedly pointed their guns at the children. (*Id.* ¶ 92.) Plaintiffs allege that seven years later, the trauma of the experience continues to harm them. McCrory has trouble falling asleep at night and is quiet or even aggressive towards others. (*Id.* ¶¶ 100–01.) Prior to the search, she had no trouble sleeping and was a cheerful, social child. (*Id.*) McCrory also lost trust in the police; she turns away when she sees them and feels nervous

around them. (*Id.* ¶ 102.) Similarly, Bell was traumatized by the noise, the commotion, and her grandmother's terrified reaction to the events. (*Id.* ¶¶ 103–06.)

### III. *Monell*-Specific Facts

In addition to recounting the events related to the search of Green's residence, Plaintiffs also allege a number of facts specific to their *Monell* claim. For example, Plaintiffs claim that the City's Independent Police Review Authority ("IPRA") either failed to investigate or improperly investigated thousands of complaints against CPD officers "[f]or years" before the search in question. (*Id.* ¶ 22.) Indeed, even though Green complained to the IPRA after the search, the IPRA did not contact her back. (*Id.* ¶ 90.) The FAC identifies ten other incidents about which citizens complained to the IPRA or its successor entity (or even the courts) with no resulting discipline. (*Id.* ¶¶ 129–138.) Plaintiffs reference a "code of silence" that contributed to the failure of the IPRA and other internal review boards to properly investigate complaints of excessive force against children or against their close relatives in the children's presence. (*Id.* ¶ 144.) The lack of discipline led CPD officers "to be confident that such actions are acceptable and will not be challenged" by investigatory bodies. (*Id.* ¶ 142.)

What is more, a 2017 Department of Justice Report concluded that the CPD has a pattern or practice of using excessive force against citizens, including children. (FAC ¶ 20; City's Reply Br., Ex. A ("DOJ Report") at 34–35, Dkt. No. 70-1.) A 2016 Police Accountability Task Force Report similarly recommended specific reforms aimed at training CPD officers on improving their interactions with children to avoid unnecessary trauma. (FAC ¶ 21; City's Reply Br., Ex. B ("PATF Report") at 54–56, Dkt. No. 70-2.) Still, the City made no changes to its policies, procedures, or training regarding excessive force in response to the DOJ Report, the PATF Report, or other relevant incidents. (FAC ¶¶ 23–24.)

In addition, Plaintiffs allege that the "CPD has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable, and unverified information." (*Id.* ¶ 139.) According to Plaintiffs, a significant amount of the 1,500–2,000 residential warrants that the CPD executes each year are "negative"—meaning they "do not result in either an arrest or the recovery of contraband," which Plaintiffs tie to officers relying upon faulty information when obtaining the warrant. (*Id.* ¶¶ 33, 36.) Plaintiffs also allege that the CPD has taken no action to improve warrants results. (*Id.* ¶¶ 140–41.)

## IV.     Procedural Background

The FAC asserts twelve sets of claims against the City and Officer Defendants. Count I raises *Monell* claims against the City, Count XI seeks to hold the City responsible for Officer Defendants' conduct under a *respondeat superior* theory, and Count XII seeks to hold the City responsible for indemnification under state law. With respect to Officer Defendants, Plaintiffs assert the following claims: Count II alleges excessive force in violation of the Fourth and Fourteenth Amendments, Count III alleges an unlawful search due to an invalid warrant in violation of the Fourth Amendment, Count IV alleges an unlawful search due to an unreasonable manner of entry and search in violation of the Fourth Amendment, Count V alleges false arrest and false imprisonment in violation of the Fourth and Fourteenth Amendments, Count VI alleges unconstitutional seizure of property in violation of the Fourth and Fourteenth Amendments, Count VII alleges assault under state law, Count VIII alleges false arrest and false imprisonment under state law, Count IX alleges intentional infliction of emotional distress under state law, and Count X alleges trespass under state law. The federal claims against the City and Officer Defendants are brought pursuant to 42 U.S.C. § 1983.

Officer Defendants have filed a motion to dismiss Counts III, V, VI, VIII, and X (Dkt. No. 36), and the City moves to dismiss Plaintiffs' *Monell* claims in Count I (Dkt. No. 37).

Officer Defendants' motion also challenges the proper parties to the suit and asks that the Court strike certain allegations from the FAC. Lastly, Defendants jointly move to bifurcate the *Monell* claims from the claims against Officer Defendants.

## DISCUSSION

### I.        Motions to Dismiss

The Court first considers the two motions to dismiss. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

#### A.        Officer Defendants' Motion to Dismiss

Officer Defendants move to dismiss five counts: Count III for an unlawful search due to an invalid warrant, Count V for false arrest and false imprisonment, Count VIII for false arrest and false imprisonment under state law, Count X for trespass under state law, and Count VI for unconstitutional seizure of property. The Court addresses each in turn.

##### 1.        Count III (Unlawful Search – Invalid Warrant)

Count III concerns Plaintiffs' claim that Officer Defendants' search of Green's residence was premised on an invalid warrant. In particular, Plaintiffs allege that Officer Defendants "unreasonably approved, obtained and executed a search warrant that they knew was based on unreliable information because they had not investigated, verified or corroborated with any other

source the John Doe informant's claim that [Tarvey] was in possession of a handgun in [P]laintiffs' house." (FAC ¶ 163.) Officer Defendant Stinar is the affiant on the Warrant Complaint, but Plaintiffs allege that all Officer Defendants participated in the corresponding investigation. (*Id.* ¶ 162.)

"Probable cause exists when the supporting affidavit presents a total set of circumstances which create a 'fair probability' that a search will uncover evidence of a crime." *United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Where, as here, the affidavit relies on information supplied by an informant, the totality-of-the-circumstances inquiry generally focuses on the informant's reliability, veracity, and basis of knowledge." *Junkert v. Massey*, 610 F.3d 364, 368 (7th Cir. 2010) (internal quotation marks omitted). The degree to which officers corroborated an informant's tip is one factor courts consider when "determining the sufficiency of a warrant affidavit." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1056–57 (7th Cir. 2018). Likewise, whether the officers adequately "assure[d] themselves" that an informant was reliable before submitting a warrant application based on the informant's tip may speak to whether they acted with "reckless disregard for the truth" such that they unconstitutionally "procured the warrant by misrepresentation." *Taylor v. Hughes*, 26 F.4th 419, 426–27 (7th Cir. 2022). The officers' knowledge when they applied for the warrant is what matters for probable cause, not hindsight. *Edwards*, 907 F.3d at 1057.

Here, Plaintiffs have sufficiently pleaded a claim for an invalid search warrant due to a lack of probable cause. They allege that, because John Doe "was an admitted felon with an extensive criminal history," Officer Defendants knew or should have known his tip required thorough corroboration. (FAC ¶¶ 48, 58.) But according to Plaintiffs, Officer Defendants never independently corroborated the threshold premise underlying John Doe's tip: whether Tarvey

8

actually had a gun. (FAC ¶¶ 167–70; *see also* Warrant Complaint at 1–2.) When viewed in the light most favorable to Plaintiffs, it is plausible that the failure to perform this investigation means Officer Defendants recklessly misrepresented the existence of probable cause, thereby invalidating the warrant. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate."); *Jacobs v. City of Chicago*, 215 F.3d 758, 768 n.4 (7th Cir. 2000) ("[O]fficers seeking a search warrant relying on information provided by a confidential informant are under an obligation to take reasonable steps to confirm that information before using it in an affidavit in support of the warrant.").

To be sure, lackluster corroboration of an informant's tip does not always doom probable cause. *See Edwards*, 907 F.3d at 1058 (describing how a "careful and detailed review of the record" at summary judgment pointed to "multiple other factors strongly supporting a finding of probable cause"). But at this point, there is no factual record the Court can reference to assess the amount of further investigation Officer Defendants needed to undertake to confirm that John Doe's tip supported probable cause. Indeed, when it comes to measuring probable cause, "[c]ases that test the sufficiency of affidavits for warrants obtained based on informants are highly fact-specific." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). Such factually intensive inquiries are typically suited for summary judgment as opposed to motions to dismiss. *Gay v. Robinson*, No. 08-4032, 2009 WL 196407, at *3 (C.D. Ill. Jan. 27, 2009). So, for present purposes, accepting Plaintiffs' allegations as true plausibly suggests the Officer Defendants obtained and executed the search warrant even though they did not have probable cause.

Officer Defendants' alternative argument for qualified immunity fails for similar reasons. "Qualified immunity involves a two-pronged inquiry: (1) whether the facts, read in favor of the non-moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation." *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). "The officer wins if the answer to either question is 'no.'" *Id.* Nonetheless, "[b]ecause a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (internal quotation marks omitted).

It bears repeating that assessing probable cause "necessarily" entails a "fact-intensive inquiry." *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995). That is true of this case, which counsels against granting the motion to dismiss. *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001). Further, for the reasons explained above, Plaintiffs adequately plead that Officer Defendants were "dishonest or reckless in preparing [the] warrant affidavit" given their alleged failure to corroborate John Doe's tip; if true, Officer Defendants "would not enjoy good faith immunity for civil damages" in connection with the search premised on the faulty warrant. *Taylor*, 26 F.4th at 430. Simply put, whether Officer Defendants had probable cause to obtain and execute the warrant requires more discovery, as does the question of their entitlement to qualified immunity. *See, e.g.*, *Freeman v. Brown*, No. 11 CV 05899, 2012 WL 3777074, at *3 (N.D. Ill. Aug. 29, 2012) ("Upon further development of the factual record, Defendants may ultimately be able to establish that they had probable cause to arrest Freeman, but at this stage of the proceedings, when the complaint is read as a whole, it is plausible that the Defendants lacked probable cause at the time of the arrest."). The Court therefore denies Officer Defendants' motion to dismiss Count III.

2.     **False Arrest and False Imprisonment (Counts V and VIII)**

Count V asserts a claim for false arrest and false imprisonment in violation of Plaintiffs'

constitutional right to be free from unreasonable seizures. Count VIII raises an equivalent claim

under Illinois state law. Officer Defendants argue that both counts should be dismissed because

the alleged detention took place incident to the execution of a valid warrant.

Broadly speaking, the Fourth Amendment permits officers to "detain[] the occupants of

the premises" while "executing a search warrant." *Muhammad v. Pearson*, 900 F.3d 898, 907

(7th Cir. 2018); *see also Muehler v. Mena*, 544 U.S. 93, 98–99 (2005) (explaining that officers

must "use reasonable force to effectuate the detention"). As discussed above, however, Plaintiffs

have alleged sufficient facts to support their claim that the search warrant was invalid for lack of

probable cause. It follows that any corresponding seizure would have been illegal under both

federal and state law. *See Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th Cir. 2000)

("[W]here a search is illegal and not supported by probable cause, the justification for using the

search as the foundation for the seizure disappears . . . ."); *Stokes v. Bd. of Educ. of the City of

Chi.*, 599 F.3d 617, 626 (7th Cir. 2010) ("Lack of probable cause is a common element of the

Illinois claims of false arrest, false imprisonment, and malicious prosecution."); *see also, e.g.*,

*Stanley v. Santander Consumer USA, Inc.*, No. 20-CV-05823, 2022 WL 4329086, at *2 (N.D. Ill.

Sept. 19, 2022) (noting the overlap between the standard governing a false arrest claim under

federal law and the standard governing the same claim under Illinois law).

Once more, Officer Defendants argue that qualified immunity provides an alternative

basis to dismiss Plaintiffs' federal claim. Yet the analysis above carries equal weight in this

context. Simply put, there are too many factual questions regarding probable cause to grant

qualified immunity on a motion to dismiss. *See Reed*, 906 F.3d at 548–49. For these reasons,

Officer Defendants' motion to dismiss is denied as to Counts V and VIII.

### 3. Count X (Trespass)

Next, Officer Defendants move to dismiss Count X, which asserts a trespass claim under state law. Illinois courts define "trespass" as "the entry onto the land of another without permission, invitation, or other right." *Schweihs v. Chase Home Fin. LLC*, 87 N.E.3d 1196, 1209 (Ill. App. Ct. 2021). In the warrant context, "[i]t cannot be contended that going upon the land pursuant to an express order of the court would constitute a trespass." *City of Tuscola v. Otto*, 338 N.E.2d 484, 486 (Ill. App. Ct. 1975).

Here, Plaintiffs allege that Officer Defendants were not acting pursuant to a lawful search warrant supported by probable cause and therefore had no "legal authorization to enter and search" the property. (FAC ¶ 226). Officer Defendants contend that, because a court had issued the search warrant, the warrant insulates them from liability for trespass. But as explained above, Plaintiffs sufficiently plead that the warrant was invalid for lack of probable cause, such that Officer Defendants should not have procured or executed it. As a result, their trespass claim survives too. *See, e.g.*, *Tate v. City of Chicago*, No. 19 C 7506, 2020 WL 6715660, at *6 n.2 (N.D. Ill. Nov. 16, 2020). Officer Defendants' motion to dismiss Count X is denied.

### 4. Count VI (Unlawful Seizure of Property)

Count VI alleges that Officer Defendants unconstitutionally damaged or destroyed Plaintiffs' property when carrying out the search. Officer Defendants argue that the count must be dismissed because all allegations of damaged or destroyed property relate to Green's property, not Bell's or McCrory's property.[6] Plaintiffs respond that their claim relates to the deprivation of their possessory interests in the house, property within the house, and the house's fixtures.

---

[6] As discussed below, Bell and McCrory are the only plaintiffs with surviving claims. Green's property interests therefore do not affect this analysis.

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513 (7th Cir. 2020) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Whether Plaintiffs suffered a seizure "turns on whether [they] alleged facts sufficient to support the inference that [they] had some possessory interest in" the property. *Id.* As Officer Defendants note, Green was the only person who had a possessory interest in much of the property seized during the search. Even though McCrory lived at the house and Bell was staying there, it is not plausible to infer that either had a possessory interest in Green's bed, clothes, personal property, cash, pillowcases, or documents. (FAC ¶¶ 83–84, 86.)

The only other item potentially seized in the search was McCrory's bedroom door, which officers broke. (*Id.* ¶ 75.) This issue presents a closer call. In *Dix*, the Seventh Circuit distinguished between degrees of property interests under Illinois law. *Dix*, 978 F.3d at 514–15. On one hand, a lease creates a possessory interest by permitting the tenant's "exclusive possession of the premises against all the world, including the owner." *Id.* at 514 (quoting *Millennium Park Joint Venture, LLC v. Houlihan*, 948 N.E.2d 1, 18 (Ill. 2010)). On the other hand, a license does not create a possessory interest; it "merely confers a privilege to occupy the premises under the owner." *Id.* (quoting *Millennium Park Joint Venture, LLC*, 948 N.E.2d at 18). The Seventh Circuit has described "a teenager living with her parents" as a licensee—meaning Illinois law did not afford the teenager any possessory interest in the home. *Id.* at 515 (citing *Meyn v. Seidel*, No. 2-09-1293, 2011 WL 10108515, at *5 (Ill. App. Ct. Mar. 22, 2011)).

Plaintiffs allege no facts giving rise to the assumption that this scenario differs from that in *Dix*. Indeed, the only reasonable inference here seems to be that McCrory—unlike Green— had "no right or privilege" to control the use of the bedroom door. *Id.* at 516. Put another way,

she did not have a possessory interest in the door. Officer Defendants' motion to dismiss Count VI is accordingly granted.

### B.     The City's Motion to Dismiss

The Court next turns to Plaintiffs' *Monell* claims in Count I. Under *Monell*, a municipality is only liable for an injury caused by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. Such claims do not impose a pleading standard "more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure." *White v. City of Chicago*, 829 F.3d 837, 844–45 (7th Cir. 2016) (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)).

*Monell* liability may rest on "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (internal quotation marks omitted). In addition, a plaintiff must allege "culpability, meaning, at a minimum, deliberate conduct," and "causation, which means the municipal action was the 'moving force' behind the constitutional injury." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404–07 (1997)).

Here, Plaintiffs characterize their *Monell* claims as seeking relief under at least six theories of liability: (1) the City's widespread practice of deploying excessive force against children; (2) the City's widespread practice of failing to investigate and discipline officer misconduct, including excessive force against children; (3) the lack of City policy regarding when it is appropriate to point guns at children; (4) the City's failure to train officers to refrain

14

from pointing guns at and using excessive force against children; (5) a *de facto* policy of a code of silence that contributed to the failure to investigate instances of officers using excessive force against children; and (6) the City's widespread practice of obtaining search warrants based on unverified information from unreliable sources.

### 1. Use of Force against Children

Plaintiffs have adequately pleaded the first five theories, each of which concern the use of excessive force against children. The Court addresses the theories below.

To start, "an unlawful official policy and widespread custom" for *Monell* purposes refers to a practice "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision" *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (internal quotation marks omitted). Here, with respect to the allegedly widespread practice of using excessive force against children, the City faults Plaintiffs for relying on only ten specific incidents, five of which postdated the events involving Plaintiffs themselves. (FAC ¶¶ 129–38.) But incidents that occur after the events of the dispute can still suggest a "pre-existing practice or custom." *Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354, at *11 (N.D. Ill. Oct. 18, 2016). The findings from the DOJ Report provide further support of a widespread practice. (*See* DOJ Report at 34–35 (describing how "CPD's pattern or practice of unreasonable force includes the use of excessive less-lethal force against children"); FAC ¶ 20.) Likewise, in support of their theory regarding a practice of failing to investigate such incidents of excessive force, as well as their theory about a *de facto* policy of silence, Plaintiffs list many incidents in which the City allegedly failed to investigate complaints. (FAC ¶¶ 129–38.) And once more, the DOJ Report buttresses these allegations. (DOJ Report at 41–45; FAC ¶ 119.)

Plaintiffs have also adequately alleged deliberate indifference for these theories. "To demonstrate that the [defendant] is liable for a harmful custom or practice, the plaintiff must

show that [the defendant's] policymakers were deliberately indifferent as to [the] known or obvious consequences." *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (third alteration in original) (internal quotation marks omitted). Again, Plaintiffs claim that the City learned of many incidents involving excessive force against children but consistently failed to respond. And at this stage, Plaintiffs' allegations support the straightforward conclusion that the City's failure to respond to previous constitutional violations had a causal relationship with the ongoing constitutional violations.

Plaintiffs' final two theories regarding excessive force are also related. First, it is possible for *Monell* liability to arise from "gaps in express policies." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022) (internal quotation marks omitted). Here, Plaintiffs claim that the City failed to implement an express policy against pointing firearms at children. Second, the Seventh Circuit has indicated its approval of *Monell* liability based on an alleged failure to train. *Flores v. City of South Bend*, 997 F.3d 725, 732–33 (7th Cir. 2021). Plaintiffs invoke this doctrine with their theory that the City failed to train officers not to point their guns at or use excessive force against children.

Plaintiffs' allegations as to these theories suffice to survive the motion to dismiss. "[A] municipality can be held liable when it has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023) (internal quotation marks omitted). Similarly, "[a] municipality can be held liable under a theory of failure to train if it has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm." *Flores*, 997 F.3d at 733. In line with the discussion above, Plaintiffs' allegations regarding the use of excessive force against children, if true, should have put the City on the requisite notice that its alleged policy gap and its alleged

failure to train was causing constitutional violations. What is more, the PATF Report supports Plaintiffs' theories to the extent it recommends that CPD officers need training to improve their interactions with children. (PATF Report at 54–56; FAC ¶ 21.) And it is reasonable to infer for present purposes that the policy gap and the lack of training caused Plaintiffs to be held at gunpoint for an extended period and suffer excessive force.

Accordingly, Plaintiff's five theories of *Monell* liability that derive from the alleged use of excessive force against children all pass muster from a pleading perspective. *See, e.g.*, *Arquero v. Dart*, 587 F. Supp. 3d 721, 728 (N.D. Ill. 2022) ("*Monell* claims are not subject to a heightened pleading standard."). The City's motion is therefore denied as to these theories.

### 2. Unreliable Search Warrants

The final *Monell* theory advanced by Plaintiffs covers different ground. Namely, Plaintiffs allege a *de facto* policy of over-reliance on tips from anonymous sources when obtaining search warrants. Unlike the discussion above, this theory is inadequately pleaded. Plaintiffs' allegations simply do not support a plausible inference that the City "established a policy or practice of intentionally" permitting officers to rely on untrustworthy sources when applying for search warrants. *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011).

Plaintiffs attempt to depict a widespread practice through reference to statistics about search warrants that do not lead to arrests or evidence. (FAC ¶¶ 36, 40.) But the required leap in logic between the two concepts is too speculative to support Plaintiffs' claim. *See Smith v. City of Chicago*, No. 21-CV-00890, 2022 WL 888942, at *7–8 (N.D. Ill. Mar. 25, 2022) (reaching the same conclusion regarding similar allegations). And although Plaintiffs cite *White*, 829 F.3d at 844–45, as indicative of a relatively low pleading threshold, "context matters." *Walker v. City of*

*Chicago*, 596 F. Supp. 3d 1064, 1074 (N.D. Ill. 2022).[7] In this context, accepting Plaintiffs'

position would "stretch the law too far, opening municipalities to liability for noncodified

customs" as long as there are bare allegations of a vague policy or practice. *Flores*, 997 F.3d at

733. As a result, the City's motion to dismiss is granted with respect to the final *Monell* theory.

## II.    Proper Parties

Officer Defendants seek dismissal of any claims to the extent the claims are asserted on

Green's own behalf on the grounds that such claims are untimely. "Because § 1983 does not

contain an express limitations period, federal courts adopt the law of the forum state." *Bowers v.*

*Dart*, 1 F.4th 513, 518 (7th Cir. 2021).  Thus, Green—who was over eighteen at the time of the

search—is subject to the two-year statute of limitations for § 1983 claims brought in Illinois. *See*

*Towne v. Donnelly*, 44 F.4th 666, 670 (7th Cir. 2022); 735 ILCS 5/13-202. In contrast, under

Illinois law, the limitations period is tolled for minor plaintiffs until they turn eighteen years old,

which has not yet occurred for either McCrory or Bell. *Wallace v. City of Chicago*, 440 F.3d 421,

425 (7th Cir. 2006); 735 ILCS 5/13-211. The events underlying this lawsuit occurred in 2015,

meaning any claims Green might have had were time-barred by the time the complaint was filed

in June 2022. Regardless, Plaintiffs concede that Green "brings no claims for herself here" and

"asserts all 12 counts in the amended complaint for [McCrory], her daughter, and [Bell], her

granddaughter." (Pls.' Resp. Br. at 43–44.) To that end, the only Plaintiffs named in the case

caption are McCrory and Bell. So, the Court treats McCrory and Bell as the sole plaintiffs in this

dispute.

---

[7] In *White*, the Seventh Circuit reasoned that the plaintiff had sufficiently pleaded his *Monell* claim in part
because officers regularly used a "standard printed form" that contributed to the alleged pattern of
violations. *White*, 829 F.3d at 844. Plaintiffs do not offer a similar allegation here.

Next, Officer Defendants argue that Green does not have standing to sue as Bell's next friend. Minors who lack a general guardian, committee, conservator, or like fiduciary may sue through a next friend. Fed. R. Civ. P. 17(c). Plaintiffs allege that Bell is Green's granddaughter but do not allege that Green was Bell's guardian or that she had legal custody over Bell. Absent such an allegation, Officer Defendants argue, the proper person to assert Bell's rights is either one of her parents. Plaintiffs respond that Bell's mother, Anita Bell, will represent Bell in this action going forward. Officer Defendants approve this solution. As such, the Court will allow Baylie Bell to proceed through Anita Bell. McCrory will continue to proceed through Green. Plaintiffs are directed to file an amended complaint that reflects this course of action.

### III.    Motion to Strike

In connection with their motion to dismiss, Officer Defendants also move to strike all or portions of the FAC's paragraphs 63–69, 76–81, and 83–89, on the grounds that they either relate to Green, as opposed to McCrory or Bell (the parties with surviving claims), or that they are inflammatory. Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike "are generally disfavored as they potentially serve only to delay the proceedings." *Arias v. Citgo Petroleum Corp.*, No. 17-cv-08897, 2018 WL 11467501, at *1 (N.D. Ill. Aug. 29, 2018). "Generally, a matter will not be stricken from a pleading unless it is clear that it can have no possible bearing on the subject matter of the litigation." *Id.* (internal quotation marks omitted).

The paragraphs in question here do not warrant striking. Paragraphs 63 through 69 describe the search. Even when the allegations refer to Green, they concern Officer Defendants' general behavior and thus relate to McCrory's and Bell's claims. In fact, most of these allegations describe events that Bell and McCrory might have seen or overheard. Next,

19

Paragraphs 76 through 81 allege that Officer Defendants detained Green's disabled son; repeatedly refused to answer questions or display the search warrant; and were rude and abrasive towards Green. Again, these allegations describe Officer Defendants actions at the scene of their alleged misconduct and relate directly to events that Plaintiffs could have plausibly witnessed, thereby contributing to their claims. Last, Paragraphs 83 through 89 primarily relate to Officer Defendants' destruction and confiscation of property. These allegations speak to Officer Defendants' conduct during the search, which is at the heart of Plaintiffs' claims. To the extent the paragraphs do not concern McCrory and Bell themselves, they once more address actions that McCrory and Bell plausibly could have witnessed.

Simply put, the paragraphs Officer Defendants cite as problematic all fit within the context of Plaintiffs' claims. The allegations describe what was happening at the scene of the alleged misconduct and speak to the reasonableness of Officer Defendants' actions given the facts and circumstances, as well as the effect on the minor plaintiffs. The motion to strike is accordingly denied.

### IV. Motion to Bifurcate

Finally, Defendants jointly move to bifurcate Plaintiffs' *Monell* claims from the claims against Officer Defendants; stay *Monell* discovery and trial until the claims against Officer Defendants are resolved; and enter a limited consent to judgment providing that, if Officer Defendants are found liable, the City consents to entry of judgment against it for compensatory damages and reasonable attorneys' fees. (Dkt. No. 39.)

Bifurcation of trials is governed by Federal Rule of Civil Procedure 42, which provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Bifurcation is "the exception and not the rule" because Rule 42

"is read in light of the overarching policy principle behind the Federal Rules, which seeks the just, speedy, and inexpensive resolution of every trial." *Black v. Hernandez*, No. 18 C 6518, 2019 WL 13166588, at *1 (N.D. Ill. Aug. 6, 2019) (internal quotation marks omitted). With these principles in mind, the Court denies Defendants' motion.

First, Defendants' request to stay the *Monell* trial until after Officer Defendants' trial is premature. This case is still at the pleadings stage; it is not clear which claims, if any, will proceed to trial. As such, it is too early to determine whether and to what extent the *Monell* evidence could affect the claims against Officer Defendants. But the Court's denial is without prejudice; Defendants are free to raise this theory closer to trial when the scope of issues is clearer. For similar reasons, the Court also denies the limited consent to judgment as premature. But what is more, Defendants' suggestion that "if the individual defendants are not found liable to Plaintiffs, there is no basis on which to impose liability on the City pursuant to *Monell*" (Defs. Joint Mot. to Bifurcate at 12, Dkt. No. 39.) is incorrect as a matter of law. As the Seventh Circuit has recognized, "individual liability is not a prerequisite for a *Monell* claim. Indeed, that is a central point of Monell: the municipal entity is liable for its own actions, not merely because of the wrongful conduct of one of its employees." *Burton v. Ghosh*, 961 F.3d 960, 972 (7th Cir. 2020).

Defendants' request to stay *Monell* discovery is denied too. Formal bifurcation between individual claims and *Monell* claims complicates discovery, which could lead to excess litigation and undue delays. In other words, bifurcation of discovery would likely reduce the prospects of streamlined discovery. *See Bradley v. City of Chicago*, No. 09 C 4538, 2010 WL 432313, at *3 (N.D. Ill. Feb. 3, 2010) ("[T]here are already discovery disputes brewing on the horizon that will be caused by bifurcation."). The Court may reconsider its ruling depending upon the progress of

discovery, but it is too early at this stage to formally bifurcate. So, discovery will continue on all surviving claims. The parties should endeavor to work with the Court to actively manage the discovery process so that unnecessary disputes can be avoided.

## CONCLUSION

Officer Defendants' motion to dismiss (Dkt. No. 36) is granted in part and denied in part. Plaintiffs' unlawful search claims (Count III), false arrest and false imprisonment claims (Counts V and VIII), and trespass claims (Count X) survive, but their claims for unlawful seizure of property (Count VI) do not. The City's motion to dismiss (Dkt. No. 37) is also granted in part and denied in part. Whereas Plaintiffs' *Monell* claims (Count I) survive as to all their theories relating to the use of excessive force against children, their allegations do not plausibly support their theory regarding a widespread practice of obtaining warrants based on unreliable tips from confidential informants. Officer Defendants' motion to strike is denied. Finally, Defendants' joint motion to bifurcate (Dkt. No. 39) is denied.

ENTERED:

Dated:  March 30, 2024

Andrea R. Wood
United States District Judge